******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* ESTRELLA J.C.*
(AC 37190)

Keller, Mullins and Norcott, Js.

*Argued May 17—officially released October 18, 2016*

(Appeal from Superior Court, judicial district of New Haven, geographical area number twenty-three, B. Fischer, J.)

*Alice Osedach*, senior assistant public defender, for the appellant (defendant).

*Ronald G. Weller*, senior assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Laura DeLeo*, senior assistant state's attorney, for the appellee (state).

*Opinion*

KELLER, J. The defendant, Estrella J.C., appeals from the judgment of conviction, rendered following a jury trial, of two counts of risk of injury to a child in violation of General Statutes § 53-21 (a) (2) and one count of risk of injury to a child in violation of General Statutes § 53-21 (a) (1). On appeal, the defendant claims that the trial court committed reversible error by (1) admitting into evidence a video recording of a forensic interview between a clinical social worker and the victim, (2) imposing an illegal sentence, and (3) admitting harmful uncharged misconduct evidence. We affirm the judgment of conviction.

The jury reasonably could have found the following facts. The victim was born on October 24, 2000, and the defendant is his biological mother. The defendant met the victim's father, F, approximately one and one-half years before the victim was born. In 2005, the defendant gave birth to the victim's sister, B, whose father is also F. From 2000 to 2005, the defendant and F maintained an "on again, off again" relationship, but they did not live together, and they never married. In 2005, when the victim was five years old, he maintained a permanent residence with the defendant at her home in New Haven. The victim eventually began residing with F at his home in East Haven as well, but he still would spend certain nights and days with the defendant at her New Haven home.

During this time, on more than five occasions, the defendant pulled down the victim's pants and under-pants, and touched the victim's penis with her hands or her mouth. The first time that one of these incidents happened was when the victim was between seven and eight years old.

On one such occasion, the victim and the defendant were in the defendant's bedroom. The victim was partially asleep, but he awoke when he felt and saw the defendant "squishing" his penis while she was on top of him. While this occurred, the victim kept one eye open, but he eventually opened both eyes so that the defendant could tell that he was awake. After realizing that the victim was awake, the defendant told the victim that she was checking his penis to see if it was healthy. On another such occasion, the defendant also touched the victim's penis with her mouth.[1] On another one of these occasions, the victim walked by the defendant's bedroom while she was naked in her bed. The door was open, and she told the victim to come inside. The victim refused to come into the room and he ran to the garage. The defendant then found the victim hiding in the garage. She hit him on his arm and forced him to go back into her bedroom and remove his clothing. The defendant then "squished" the victim's penis with her hands and put her mouth on it as well.

Also during this time period, while the victim was residing with the defendant at her New Haven home, the defendant, on at least two occasions, forced the victim to watch pornographic movies. The defendant also threatened the victim by telling him that she would hit him if he refused to watch the movies.

On at least several other occasions during this time period, while the victim was seven years old, and on another occasion when the victim was eight years old, he and the defendant were alone in the living room at her New Haven home when the defendant forced the victim to touch her breasts for approximately five to ten minutes. The defendant also threatened the victim by telling him that if he refused to touch her breasts, she would "hit him hard."

On at least several other occasions when the victim was eight years old, while the victim and B were sleeping in the defendant's bedroom, the victim awoke to find the defendant having sexual intercourse with her boyfriend, N, in the same bed in which the victim and B were sleeping. Also on this occasion, the defendant and N were watching a pornographic movie while they engaged in sexual intercourse. On another occasion, the victim found several pornographic videos and photographs on the defendant's computer. When the defendant discovered that he had found the materials, she told him that if he told anyone about his discovery, she would harm F and kill the victim's stepmother, C. Furthermore, on another occasion, while the victim was in the car with the defendant and the victim's aunt, the victim overheard the defendant say that she was going to kill F and C.

On another occasion, when the victim was eight or nine years old, the defendant forced the victim to take a shower with her. During this incident, the defendant forced the victim to touch her breasts, and told him that if he refused, she would hit him.

The victim eventually began living with F and C at F's home in East Haven. The victim's and B's visitations with the defendant at her home terminated in the summer of 2009, but they resumed at some point in late 2009.

After the commencement of these incidents, the victim began having nightmares, and F frequently observed that the victim was "changed" when he returned to F's home after visiting with the defendant. The victim also began misbehaving in school, particularly in the spring of 2010. Specifically, the victim stole items from others at school, and he fought with other students. On one such occasion during this time period, the victim stole an iPod from a teacher, and, after being apprehended, he subsequently was suspended from school and was placed in a disciplinary program.

On one day in April, 2010, the victim came home from school crying. C asked the victim why he was crying

and if he had misbehaved at school. In response, the victim told C that the defendant had touched his penis. C comforted the victim and called F, telling him that the victim needed to talk to him about something when he returned home from work. Later that night, F came home from work, and the victim told him that the defendant had touched his penis and threatened him on numerous occasions while he had been residing at her home in New Haven.

Shortly after the victim told F about the defendant's actions toward the victim, F, on that same night, placed telephone calls to the police and the Department of Children and Families (department) to report the incidents that had occurred between the defendant and the victim. When F called the department on that night, however, there was no answer on the telephone, so, on the next day, F went to the Clifford Beers clinic (Clifford Beers) in New Haven and scheduled an appointment for the victim to see a psychologist there on the following day. On the date of the scheduled appointment, the victim went to Clifford Beers with F and C. During this visit, F and C gave permission for several professionals at Clifford Beers to interview and provide therapy to the victim in connection with the incidents that he had reported involving the defendant's actions toward him. Dr. Alyson Brodhagen, a clinical psychologist at Clifford Beers, diagnosed the victim with post-traumatic stress disorder. After this initial meeting, which occurred in April, 2010, the victim continued to participate in therapy consultations with professionals at Clifford Beers until the commencement of the defendant's trial in 2012.

On May 3, 2010, after having visited Clifford Beers, the victim met with Theresa A. Montelli, a licensed clinical social worker employed by Yale-New Haven Hospital as a forensic interviewer for the Yale Child Sexual Abuse Clinic (Yale clinic). During this interview, the victim discussed the incidents that had occurred between the defendant and himself. Specifically, during this interview, the victim pointed out on anatomical diagrams and dolls where the defendant had touched him, and he conveyed some of the details about these incidents to Montelli. This interview was recorded on video, and, while it was occurring, it was observed by a department employee, another forensic interviewer from the Yale clinic, and a New Haven Police Department detective, who observed the interview from a separate room on a closed circuit television screen.

Several days later, on May 7, 2010, the victim met with Janet Murphy, a pediatric nurse practitioner at the Yale clinic, for a medical evaluation.[2] Although Murphy did not observe the forensic interview that Montelli conducted, she met with Montelli after the interview and learned about the victim's history, the circumstances surrounding his relationship with his family, and "the relevant details" for the medical evaluation.

Additionally, before conducting the medical evaluation of the victim, Murphy met with C to obtain any further necessary health information about the victim.[3] Murphy then completed a full physical examination of the victim.

In June, 2010, the victim also began meeting with Dr. Ragne Pajo Adams, a psychologist at Clifford Beers, for outpatient therapy sessions. At some point after August, 2010, the victim also saw a psychiatrist, Dr. Thomas Prakash, who diagnosed him with attention deficit hyperactivity disorder, for which he also was treated.

On the basis of the victim's disclosures made during his interview with, inter alia, the professionals working at the Yale clinic, as well as the victim's disclosures to the professionals working at Clifford Beers, Detective William White, Jr., of the New Haven Police Department prepared an arrest warrant for the defendant and she was arrested. The state charged the defendant with two counts of risk of injury to a child in violation of § 53-21 (a) (2), and a third count of risk of injury to a child in violation of § 53-21 (a) (1).[4] After a trial in May, 2012, the jury found the defendant guilty on all counts. The court, *B. Fischer, J.*, on October 2, 2013, sentenced the defendant, on each of the two counts of risk of injury to a child in violation of § 53-21 (a) (2), to twelve years of imprisonment, execution suspended after the service of eight years, five years of which was a mandatory minimum sentence, followed by ten years of probation. On the third count of risk of injury to a child in violation of § 53-21 (a) (1), the defendant was sentenced to a period of ten years imprisonment, execution suspended after eight years, and five years probation. All sentences were to run concurrently. The total effective sentence was twelve years imprisonment, suspended after the service of eight years, with ten years probation. This appeal followed. Additional facts will be set forth as necessary.

I

We first address the defendant's claim that the court committed reversible error by admitting into evidence, under the medical diagnosis and treatment exception to the hearsay rule, the video recording of the forensic interview between Montelli and the victim. The defendant argues that the state had not met its burden of showing that the essential purpose of the interview was to further the victim's medical treatment. The following additional facts and procedural history are relevant to this claim. Prior to the commencement of the defendant's criminal trial, the state, pursuant to General Statutes § 54-86g and *State* v. *Jarzbek*, 204 Conn. 683, 529 A.2d 1245 (1987), cert. denied, 484 U.S. 1061, 108 S. Ct. 1017, 98 L. Ed. 2d 982 (1988), filed a motion seeking to elicit the victim's trial testimony outside of the presence of the defendant through the use of a video recording. After the court, *Fasano, J.*, held a hearing on October

26, 2011, it granted the state's motion in an oral decision issued on October 31, 2011, concluding that "the state ha[d] established a compelling need for the [victim] to testify outside the presence of the defendant . . . by clear and convincing evidence in that the [victim] would be so intimidated or otherwise inhibited by the . . . physical presence of the defendant that the trustworthiness or reliability of the [victim's] testimony would be seriously called into question."

On March 2, 2012, pursuant to the court's ruling on the state's *Jarzbek* motion, the victim testified under oath at Southern Connecticut State University in front of the court, *B. Fischer, J.*, two state's attorneys, trial counsel for the defendant, two interpreters, the victim's guardian ad litem, a temporary assistant clerk, and a certified court reporter. In addition to being subject to direct examination by the prosecutor who tried the defendant's criminal case, the victim was subjected to cross-examination by the defendant's trial counsel. The victim's testimony was videotaped and reproduced in a video recording. During the hearing, the state questioned the victim about, inter alia, the forensic interview that he participated in at the Yale clinic with Montelli.

On May 4, 2012, after the conclusion of jury voir dire proceedings and outside the presence of all potential jurors, the state indicated its intent to introduce into evidence the video recording of the victim's forensic interview with Montelli. Defense counsel objected to the state's offer of the video recording of the forensic interview, arguing that it should not be admitted into evidence because (1) defense counsel was not present at the interview and the confrontation clause of the sixth amendment to the United States constitution accordingly would prohibit the introduction of such evidence, and (2) Montelli brought up the subject of the defendant's drinking habits during the interview, which defense counsel argued was highly prejudicial and of little probative value. In response, the state argued that "it [was] the state's intention with respect to the contents contained in the video to establish that the questions and answers were for the purpose of mental treatment." The state also argued that its "response to the video being used versus the witness [Montelli] simply testifying as to the questions and the answers, and the information elicited simply is that [the video is] the best evidence that exists of what actually transpired." Furthermore, the state argued that the video recording of the forensic interview was the best evidence that existed because it was "better than [Montelli] trying to articulate [the victim's] nonverbal response and what [Montelli observed, given that] she would be anticipated to testify that the video . . . is a fair and accurate representation of what actually transpired." Finally, the state argued that the video recording of the forensic interview was relevant and was "not prohibited hearsay by virtue of the fact that the

information elicited was for the purpose of treatment."[5]

On May 7, 2012, the first day of the defendant's trial, the court, after allowing both sides to argue further on the issue and clarifying that the defendant's objection included a claim that the medical diagnosis and treatment exception did not permit either the video recording or Montelli's testimony to be admitted,[6] ruled that the video recording of the forensic interview with Montelli and her testimony were both admissible. With respect to the video recording of the forensic interview, the court first referred to the text of § 8-3 (5) of the Connecticut Code of Evidence, which provides in relevant part: "The following are not excluded by the hearsay rule, even though the declarant is available as a witness . . . (5) A statement made for purposes of obtaining a medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof, insofar as reasonably pertinent to the medical diagnosis or treatment."

Thereafter, the court stated in relevant part: "And . . . our case law has expanded it from doctors to other medical professionals, including social workers, who are acting in the chain of medical diagnosis. In the case of [*State* v. *Cruz*, 260 Conn. 1, 792 A.2d 823 (2002)] the victim was interviewed by a social worker at the hospital. The court held that . . . the medical treatment exception to the hearsay rule applies to statements made by a sexual assault victim to a social worker who is acting within a chain of medical care as long as those statements are made for the purpose of obtaining medical diagnosis or treatment and are pertinent to the diagnosis or treatments . . . . So, I think . . . [§ 8-3 (5) of the Connecticut Code of Evidence] applies and I will allow the forensic interview as evidence here."

On the next day of trial, the state presented the testimony of Montelli on the witness stand, and during her testimony, the state offered the video recording of the forensic interview, which it then played in front of the jury.

On appeal, the defendant claims that the court erred by admitting the video recording of the forensic interview because it contained hearsay and it was not shown to have been carried out for the purpose of medical treatment. In opposition, the state argues that the court did not abuse its discretion by admitting into evidence the video recording of the forensic interview because the state presented sufficient evidence at trial that the primary purpose of the interview was for medical treatment, which allowed its admission under the medical diagnosis and treatment hearsay exception. Alternatively, the state argues that any error was harmless to the defendant. We agree with the state that the court did not abuse its discretion by admitting into evidence the video recording of the forensic interview.

We begin our analysis of this claim with the appropriate standard of review. "To the extent [that] a trial court's admission of evidence is based on an interpretation of the Code of Evidence, our standard of review is plenary. For example, whether a challenged statement properly may be classified as hearsay and whether a hearsay exception properly is identified are legal questions demanding plenary review. . . . We review the trial court's decision to admit evidence, if premised on a correct view of the law, however, for an abuse of discretion. . . . In other words, only after a trial court has made the legal determination that a particular statement is or is not hearsay, or is subject to a hearsay exception, is it vested with the discretion to admit or to bar the evidence based upon relevancy, prejudice, or other legally appropriate grounds related to the rule of evidence under which admission is being sought." (Internal quotation marks omitted.) *State* v. *Griswold*, 160 Conn. App. 528, 536, 127 A.3d 189, cert. denied, 320 Conn. 907, 128 A.3d 952 (2015).

At the outset of our analysis, we note that the defendant argues that the court, by admitting the video recording of the victim's forensic interview with Montelli, violated her sixth amendment right to confront witnesses against her pursuant to *Crawford* v. *Washington*, 541 U.S. 36, 68–69, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), because the statements made by the victim during that interview were testimonial in nature. With respect to this claim, which is distinct from her evidentiary claim related to the admissibility of the video recording, she relies on *State* v. *Maguire*, 310 Conn. 535, 78 A.3d 828 (2013), and contends that the court erred in admitting the video recording under the medical treatment exception to the hearsay rule without first finding that the forensic interview was not testimonial in nature. The defendant argues that the interrogation conducted by Montelli was intended primarily to further the criminal investigation and preparation for her prosecution, and not to provide medical assistance to the victim. In so arguing, she relies on the principle that "statements taken by government actors who are not members of law enforcement are testimonial if the interview is the functional equivalent of police interrogation with the primary purpose of establishing or proving past events potentially relevant to later criminal prosecution." *State* v. *Arroyo*, 284 Conn. 597, 629, 935 A.2d 975 (2007).

The state argues that because the victim was available and was subject to cross-examination at trial, there was no constitutional violation. Moreover, the state claims the defendant's reliance on *Maguire* is misplaced because that case involved similar evidence admitted under the tender years exception to the hearsay rule, rather than the medical treatment exception. Finally, the state asserts that any error was harmless because

the statements made during the forensic interview were cumulative of other properly admitted and unchallenged evidence.

Recently, in *State* v. *Griswold*, supra, 160 Conn. App. 550, this court held that there was no error in the admission of video recordings of the forensic interviews of two victims, as well as the summaries of such interviews, under the medical diagnosis and treatment exception. The defendant in that case argued that if the video recordings and summaries were not admissible under the tender years exception as a result of the holding in *Maguire*, then they likewise were inadmissible under the medical diagnosis and treatment exception. We began our analysis in *Griswold* by first clarifying the important point that, because the victims appeared at trial and were subject to cross-examination by the defendant, *Crawford* and its progeny did not directly apply. Id., 550–51. Although the victim in the present case did not testify while he was physically in the presence of the defendant and the jury, he nevertheless testified and was cross-examined by the defendant's attorney in a trial setting pursuant to the court's ruling on the state's *Jarzbek* motion. A minor victim's videotaped testimony pursuant to *Jarzbek* procedures is the "functional equivalent of testimony in court." (Internal quotation marks omitted.) *State* v. *Arroyo*, supra, 284 Conn. 621. Accordingly, because, in the present case, the victim's testimony was elicited under circumstances which permitted the defendant's attorney to cross-examine him—which he did, in fact, do— a sixth amendment violation does not exist.

Thus, although we concluded in *Griswold* that the victims' statements were testimonial in nature, we did not conclude that they were barred by the sixth amendment's confrontation clause, as *Crawford* would have required if the victims were unavailable to testify at trial and there had been no prior opportunity for cross-examination. Rather, we determined that the video recordings and written summaries did not satisfy one criterion set forth in the tender years exception for admissibility thereunder—a prohibition against statements made in preparation of a legal proceeding.

We then observed, "in contrast to the tender years exception, the medical diagnosis and treatment exception to the hearsay rule contains no language expressly or implicitly importing *Crawford*'s prohibition against testimonial hearsay. The exception provides only that statements 'made for purposes of obtaining a medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof, insofar as reasonably pertinent to the medical diagnosis or treatment,' are not excluded by the hearsay rule. Conn. Code Evid. § 8-3 (5). Neither this language, nor any common-law principle that we

are aware of, mandates that statements offered under the exception be nontestimonial. Rather, their admissibility turns principally on whether 'the declarant was seeking medical diagnosis or treatment, and the statements are reasonably pertinent to achieving those ends.'" (Footnote omitted.) *State* v. *Griswold*, supra, 160 Conn. App. 552.

Therefore, the thrust of the defendant's argument with respect to the court's admission of the videotaped recording of the forensic interview between the victim and Montelli focuses on the issue of whether the recording properly was admitted under the medical diagnosis and treatment exception to the hearsay rule. Section 8-3 of the Connecticut Code of Evidence, titled "Hearsay Exceptions: Availability of Declarant Immaterial," provides that twelve types of statements "are not excluded by the hearsay rule, even though the declarant is available as a witness." The fifth subsection of this section, titled "Statement for purposes of obtaining medical diagnosis or treatment," provides that the following type of statement is not inadmissible under the hearsay rule: "A statement made for purposes of obtaining a medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof, insofar as reasonably pertinent to the medical diagnosis or treatment." Conn. Code Evid. § 8-3 (5). The admissibility of statements offered under the medical diagnosis and treatment exception to the hearsay rule turns on whether "the declarant was seeking medical diagnosis or treatment, and the statements are reasonably pertinent to achieving those ends." (Internal quotation marks omitted.) *State* v. *Griswold*, supra, 160 Conn. App. 552.

This court, in *State* v. *Griswold*, supra, 160 Conn. App. 528, recently analyzed the medical diagnosis and treatment exception to the hearsay rule. In *Griswold*, minor victims of sexual assault recounted their recent experiences in forensic interviews conducted by members of a "multidisciplinary investigative team" of professionals at the Greater Hartford Children's Advocacy Center (advocacy center). Id., 531. The members of the multidisciplinary investigative team consisted of a clinical child interview supervisor at the advocacy center and a clinical child interview specialist. Id. The victims, already having told their mother about the defendant's actions toward them, participated in videotaped forensic interviews, during which they again shared their recollections of the defendant's actions with the multidisciplinary investigative team at the advocacy center. Id. Before the defendant's subsequent criminal trial, the state offered as evidence the video recordings of the forensic interviews, and the defendant filed a motion in limine to preclude their admission into evidence on the grounds that they constituted hearsay and were unfairly prejudicial. Id., 532. In response, the

state argued that the recordings were admissible under two exceptions to the hearsay rule, the tender years exception[7] and the medical diagnosis and treatment exception. Id. The trial court denied the defendant's motion in limine and, in doing so, concluded that the video recordings were admissible under both the tender years, and the medical diagnosis and treatment exceptions to the hearsay rule. Id., 534. On appeal, this court concluded that (1) the trial court improperly admitted the video recordings under the tender years exception because the circumstances surrounding the forensic interviews were such that an objective observer would conclude that their primary purpose was not to provide the victims with medical diagnosis or treatment, but "to [establish] or prov[e] past events potentially relevant to later criminal prosecution"; (internal quotation marks omitted); id., 547; but (2) the trial court properly admitted the video recordings under the medical diagnosis and treatment exception because the victims' statements adduced in the forensic interviews "were reasonably pertinent to obtaining medical diagnosis or treatment"; id., 557; and the professionals participating in the forensic interviews "sufficiently occupied a position within the chain of medical care, to bring the victims' statements within the scope of the medical diagnosis and treatment exception." Id.

In analyzing the defendant's claim with respect to the medical diagnosis and treatment exception, this court stated the following, which we find to be instructive in the present case: "In the context of a forensic interview, [the standard for the admissibility of statements under the medical diagnosis and treatment exception] is substantially less demanding than the one imposed by *Crawford* and incorporated into the tender years exception. Undoubtedly, statements may be reasonably pertinent . . . to obtaining medical diagnosis or treatment even when that was not the *primary purpose* of the inquiry that prompted them, or the principal motivation behind their expression. See *State* v. *Donald M.*, 113 Conn. App. 63, 71, 966 A.2d 266 (forensic interview statements admissible under medical diagnosis and treatment exception because the purpose of the interview was, *at least in part*, to determine whether the victim was in need of medical treatment [emphasis added]), cert. denied, 291 Conn. 910, 969 A.2d 174 (2009). Consequently, we anticipate that in most circumstances, the task of demonstrating that a statement made during a forensic interview satisfies the medical diagnosis and treatment exception will be less onerous than establishing that it is admissible under the tender years exception.

\* \* \*

"Having concluded that the applicability of the medical diagnosis and treatment exception to the hearsay rule must be determined on its own merits, we set forth

the relevant legal principles that guide our resolution of this question. Out-of-court statements made by a patient to a [medical provider] may be admitted into evidence if the declarant was seeking medical diagnosis or treatment, and the statements are reasonably pertinent to achieving these ends. . . . The rationale for excluding from the hearsay rule statements made in furtherance of obtaining treatment is that we presume that such statements are inherently reliable because the patient has an incentive to tell the truth in order to obtain a proper medical diagnosis and treatment. . . . The term medical encompasses psychological as well as somatic illnesses and conditions. . . . Statements made by a sexual assault complainant to a social worker may fall within the exception if the social worker is found to have been acting within the chain of medical care. . . . Although [t]he medical treatment exception to the hearsay rule requires that the statements be both pertinent to treatment and motivated by a desire for treatment . . . in cases involving juveniles, [we] have permitted this requirement to be satisfied inferentially." (Citations omitted; emphasis in original; footnote omitted; internal quotation marks omitted.) *State* v. *Griswold*, supra, 160 Conn. App. 552–56. Applying these principles, this court noted that the record in that case provided sufficient evidence demonstrating that the victims' statements made in the forensic interviews were reasonably pertinent to their obtaining medical diagnosis and treatment. Id., 557. In this vein, this court took particular note of the fact that the information obtained from the minor victims' statements in the forensic interviews was provided to their medical providers and mental health practitioners. Id. Furthermore, this court focused on the fact that the professionals conducting the forensic interviews, as necessary, made referrals for mental health and medical treatment at the conclusion of each interview. Id. Finally, this court took particular note of the fact that the advocacy center performed physical and mental health examinations on victims of sexual abuse on-site. Id.

In the present case, guided by *Griswold*, we conclude that the court properly admitted into evidence the video recording of the forensic interview between Montelli and the victim because the victim's statements made during the interview fell under the medical diagnosis and treatment exception to the hearsay rule. We reach this conclusion because the state adequately demonstrated that an objective observer could determine that the victim's statements to Montelli during the forensic interview were reasonably pertinent to obtaining medical treatment and that Montelli sufficiently occupied a position within the chain of medical care. See id.; see also *State* v. *Cruz*, supra, 260 Conn. 6 ("[w]e . . . conclude that the medical treatment exception to the hearsay rule applies to statements made by a sexual assault victim to a social worker who is acting within the chain

of medical care, as long as those statements are made for the purpose of obtaining medical diagnosis or treatment and are pertinent to the diagnosis or treatment sought"). Furthermore, given that the medical diagnosis and treatment exception does not require that the primary purpose of the forensic interview and the statements made by the victim therein be for medical treatment, we are satisfied that the victim's statements fell within the exception despite the facts that a police officer and a department social worker were observing the interview, it was recorded, and Montelli's questions largely focused on determining what had happened to the victim in his encounters with the defendant. We also note that the involvement of a police officer in the interview does not automatically preclude a statement from falling within the medical diagnosis and treatment exception. See, e.g., *State* v. *Miller*, 121 Conn. App. 775, 783, 998 A.2d 170 ("[W]e are not persuaded by the defendant's argument that because the victim knew that police officers were present during the interview, the purpose of her interview with [a licensed family therapist] was not for medical treatment. This fact does not undermine the medical treatment purpose of the interview."), cert. denied, 298 Conn. 902, 3 A.3d 72 (2010).

The record reflects that the timing and context of the forensic interview in relation to the victim's other visits to medical professionals supported the conclusion that the interview was not solely conducted in preparation for a legal proceeding, but rather was reasonably pertinent to obtaining medical treatment. After the victim revealed the details of his encounters with the defendant to F and C, the victim, as a result of those encounters, received a medical diagnosis and began receiving treatment at Clifford Beers in April, 2010. Dr. Adams, a psychologist who treated the victim at Clifford Beers in 2010, testified that Clifford Beers is a "community mental health center," and that when F and C took the victim to Clifford Beers for the first time after he disclosed the details of the defendant's actions to them, as part of the intake process, the victim was diagnosed with post-traumatic stress disorder after he was examined by Dr. Brodhagen, who is also a psychologist. From April, 2010, to approximately October, 2011, the victim continued visiting Dr. Adams for therapy sessions in order to treat this disorder. The forensic interview between the victim and Montelli took place on May 3, 2010, which was during the time period during which Dr. Adams and other professionals at Clifford Beers were treating the victim for post-traumatic stress disorder. On May 7, 2010, which was several days after the victim participated in the forensic interview with Montelli, he also visited Murphy for a medical evaluation.

Although Murphy testified that she did not observe the video recording of the forensic interview between the victim and Montelli prior to her conducting a medical evaluation of him, she testified that she met with

Montelli and discussed the relevant details of the victim's situation as they related to his encounters with the defendant. Murphy also testified that she met with C to obtain any additional necessary information pertaining to the victim's medical history prior to her conducting a medical evaluation of him. Furthermore, Murphy testified that at the commencement of her medical evaluation, she told the victim, as she normally does, that she works with Montelli and that she wanted to make sure that the victim understood that he knew that she was checking his body to make sure that he was in good physical health as a result of his previous encounters with the defendant. Murphy also testified that, as a standard operating procedure, she works closely with social workers, like Montelli, who conduct forensic interviews of victims so that she has all necessary information about the victims' medical histories and the nature of the abuse that they allegedly have experienced.[8] Finally, Murphy testified that, at the time that she conducted the medical evaluation of the victim, she was aware that Montelli had given the victim therapy referrals, and she was further aware that he had begun receiving mental health treatment at Clifford Beers.

On the basis of our review of the record, we conclude that the victim's statements made during the forensic interview with Montelli were reasonably pertinent to his receiving medical treatment. Although the victim already had been diagnosed with post-traumatic stress disorder by Clifford Beers professionals in April, 2010, his treatment for this disorder did not conclude, at the earliest, until the commencement of the defendant's criminal trial. Furthermore, as Murphy testified, she met with Montelli to discuss the forensic interview to obtain the history and other relevant details prior to conducting the physical examination of the victim. Thus, the physical examination of the victim was informed by the forensic interview. The evidence showed that both Montelli and Murphy were aware that other medical and mental health professionals were treating the victim and that part of Montelli's purpose in this regard was to elicit information to pass on to these professionals, including Murphy, so that proper treatment could be rendered. Specifically, as Murphy testified, professionals at the Yale clinic worked to ensure that the victim was receiving proper treatment from those other professionals, particularly those working at Clifford Beers.

Accordingly, we conclude that the court properly determined that the victim's statements made during the forensic interview with Montelli fell within the medical diagnosis and treatment exception to the hearsay rule, and that the court did not abuse its discretion in admitting the video recording of the forensic interview into evidence.

## II

Next, we address the defendant's claim that the court committed reversible error in imposing an illegal sentence by sentencing the defendant to a mandatory minimum sentence of five years imprisonment on each of the two counts of risk of injury to a child in violation of § 53-21 (a) (2). With respect to this claim, the defendant first argues that the court erred because the information in which the defendant was charged alleged that the offenses occurred on divers dates between 2006 and 2010, and the mandatory minimum sentencing scheme pertained only to offenses committed after July, 2007. The defendant argues that jury interrogatories should have been submitted to the jury to establish whether it found the defendant guilty on the basis of acts prior to July 1, 2007. Second, the defendant argues that the court erred by imposing an illegal sentence because, in the absence of a jury determination that the offenses occurred when the victim was under thirteen years old, the court did not have the authority to sentence the defendant to a mandatory minimum of five years of imprisonment.

In opposition, the state argues that the court did not impose an illegal sentence because the evidence adduced at trial established that all of the offenses occurred after the July 1, 2007 effective date for the mandatory minimum sentencing scheme. In response to the defendant's second argument, the state argues that it is not reviewable because it was inadequately briefed.[9] We agree with the state that the court did not err in imposing a five year mandatory minimum sentence on each count of risk of injury to a child under § 53-21 (a) (2) because the evidence adduced at trial proved that the offenses committed by the defendant in violation of § 53-21 (a) (2) occurred after July, 2007.

We begin our analysis of this claim with the appropriate standard of review. Our rules of practice provide that "[t]he judicial authority may at any time correct an illegal sentence or other illegal disposition, or it may correct a sentence imposed in an illegal manner or any other disposition made in an illegal manner." Practice Book § 43-22. Thus, "[b]oth the trial court and this court, on appeal, have the power, at any time, to correct a sentence that is illegal." (Internal quotation marks omitted.) *State* v. *Constantopolous*, 68 Conn. App. 879, 882, 793 A.2d 278, cert. denied, 260 Conn. 927, 798 A.2d 971 (2002). Because the defendant's claim involves a question of law with respect to the applicability of a statute, our review is plenary. See id., 881.

### A

We first address the defendant's argument that the court erred by imposing an illegal sentence because the information provided that all of the offenses occurred on diverse dates between 2006 and 2010. We conclude

that the court did not err in its imposition of a mandatory minimum sentence of five years imprisonment on each of the two counts of risk of injury to a child in violation of § 53-21 (a) (2).

The following additional procedural history is relevant to this argument. In relevant part, the state charged the following in the first count of the information, accusing the defendant of committing risk of injury to a child: "on divers dates between and including September, 2006, and March, 2010, in the City of New Haven, the said [defendant] did subject a child under the age of sixteen years, to wit, her son, [the victim, date of birth October 24, 2000], to contact with her intimate parts, to wit, her breast, in a sexual and indecent manner, likely to impair the health or morals of such child in violation of [§] 53-21 (a) (2) . . . ."

In relevant part, the state charged the following in the second count of the information accusing the defendant of committing risk of injury to a child: "on divers dates between and including September, 2006, and March, 2010, in the City of New Haven, the said [defendant] did have contact with the intimate parts, to wit, the penis, of a child under the age of sixteen years, to wit, her son, [the victim, date of birth October 24, 2000], in a sexual and indecent manner, likely to impair the health or morals of such child in violation of [§] 53-21 (a) (2) . . . ."

At the October 2, 2013 sentencing hearing, with respect to the defendant's commission of two counts of risk of injury to a child in violation of § 53-21 (a) (2), the court sentenced the defendant to concurrent sentences of twelve years imprisonment, execution suspended after the service of eight years, five years of which were to be a mandatory minimum sentence, followed by ten years of probation.[10]"Connecticut has recognized two types of circumstances in which the court has jurisdiction to review a claimed illegal sentence. The first of those is when the sentence itself is illegal, namely, when the sentence either exceeds the relevant statutory maximum limits, violates a defendant's right against double jeopardy, is ambiguous, or is internally contradictory. . . . The other circumstance in which a claimed illegal sentence may be reviewed is that in which the sentence is within relevant statutory limits, but was imposed in a way which violates [a] defendant's right . . . to be addressed personally at sentencing and to speak in mitigation of punishment . . . or his right to be sentenced by a judge relying on accurate information or considerations solely in the record, or his right that the government keep its plea agreement promises . . . ." (Internal quotation marks omitted.) *State* v. *Fairchild*, 155 Conn. App. 196, 204, 108 A.3d 1162, cert. denied, 316 Conn. 902, 111 A.3d 470 (2015). We confront the first of these circumstances in the present appeal.

Prior to the legislature's amendment of § 53-21 (a) in

2007, the statute provided in relevant part that "[a]ny person who . . . (2) has contact with the intimate parts as defined in section 53a-65, of a child under the age of sixteen years or subjects a child under sixteen years of age to contact with the intimate parts of such person, in a sexual and indecent manner likely to impair the health or morals of such child . . . shall be guilty of . . . a class B felony for a violation of subdivision (2) of this subsection." General Statutes (Rev. to 2007) § 53-21 (a). In 2007, however, the legislature, by virtue of its passage of No. 07-143, § 4, of the 2007 Public Acts, amended subsection (a) of § 53-21 to add, in relevant part, the following language: "except that, if the violation is of subdivision (2) of this subsection and the victim of the offense is under thirteen years of age, such person shall be sentenced to a term of imprisonment of which five years of the sentence imposed may not be suspended or reduced by the court." The effective date of this statutory amendment was July 1, 2007. Public Acts 2007, No. 07-143, § 4.

"It is axiomatic that it is the date of the crime which controls the possible punishment for the offense." (Internal quotation marks omitted.) *State* v. *Allen*, 12 Conn. App. 403, 406, 530 A.2d 670, cert. denied, 205 Conn. 809, 532 A.2d 76 (1987). It is an undisputed fact that the victim was born on October 24, 2000. The victim's testimony demonstrated that all of the defendant's abusive actions toward him occurred while he was seven years old or older, or on or after October 24, 2007. Specifically, the victim testified at trial that the first time that the defendant abused him by touching his penis occurred when he was between seven and eight years old. The victim then testified that the defendant abused him by touching his penis about five or more times after that. The victim testified that the incident where he witnessed the defendant and N having sexual intercourse with each other while he and B were trying to sleep on the defendant's bed occurred when he was between eight and nine years old. He also testified that he was "eight to nine" years old on the first occasion where the defendant forced him to touch her breasts. Furthermore, the victim testified that he was between eight and eight and one-half years old when the defendant abused him in the shower. C testified that the victim first disclosed the nature of the defendant's abusive acts toward him in April, 2010. The victim testified that when he first disclosed the nature of the defendant's abusive acts toward him to C, which would have been in April, 2010, he had experienced these acts for "about two years" prior to the date of this disclosure. Finally, the court, at the sentencing hearing, despite stating that the defendant had sexual contact with the intimate parts of the victim on numerous occasions approximately from 2006 to 2009, stated twice that the victim was seven, eight, or nine years old when the offenses occurred.

We conclude that the court did not impose an illegal sentence by imposing the five year mandatory minimum sentence for the judgment of conviction against the defendant with respect to each of her violations of § 53-21 (a) (2) because the evidence adduced at trial adequately proved that the defendant committed all of the offensive acts after July 1, 2007. We reach this conclusion because the testimony elicited at trial established that the earliest occasions on which the victim experienced abusive conduct at the hands of the defendant occurred after October 24, 2007, when he was seven years old. Although the information charged that the defendant committed the offenses "on divers dates between and including September, 2006, and March, 2010,"[11] we note that informations are not evidence. See *State* v. *Avis*, 209 Conn. 290, 308, 551 A.2d 26 (1988) (court's instruction that indictment is not to be considered as evidence was proper statement of law), cert. denied, 489 U.S. 1097, 109 S. Ct. 1570, 103 L. Ed. 2d 937 (1989). Given that a court should rely only on evidence adduced at trial in imposing a criminal sentence, the generalized time frame in the information in the present case did not render the court's sentence illegal. See *State* v. *Bazemore*, 107 Conn. App. 441, 461, 945 A.2d 987 (court properly relied on evidence presented at trial in imposing sentence), cert. denied, 287 Conn. 923, 951 A.2d 573 (2008).[12] Accordingly, we reject the defendant's first argument and conclude that the court did not err by imposing, in each of the two relevant convictions, the mandatory minimum five year sentence pursuant to the 2007 amendment to § 53-21 (a) (2).

B

Next, we address the defendant's argument that the court erred by imposing an illegal sentence because it did not have the authority to sentence the defendant to the mandatory minimum five year sentence for each of the two convictions under § 53-21 (a) (2) in the absence of a jury determination that the offenses occurred when the victim was younger than thirteen years of age. We conclude that this argument has no merit because any alleged error in this regard is harmless under the facts of this case.

The following additional procedural history is relevant to this argument. In the court's jury instructions, it instructed, inter alia, that the fourth element of the crime of risk of injury to a child in violation of § 53-21 (a) (1) and (2) required the state to prove beyond a reasonable doubt that at the time of the incident, the minor was under sixteen years of age.

In light of the fact that the sentencing portion of § 53-21 (a) (2) provides that the five year mandatory minimum sentence applies when the victim is under the age of thirteen years at the time of the commission of the crime, the defendant argues that the jury also

should have been instructed to make this specific finding with respect to the offenses charged under § 53-21 (a) (2), instead of being instructed to find that the victim was under the age of sixteen years at the time of the commission of those crimes. The defendant's argument is premised on two holdings of the United States Supreme Court, *Alleyne* v. *United States*, U.S. , 133 S. Ct. 2151, 186 L. Ed. 2d 314 (2013), and *Apprendi* v. *New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). In *Apprendi*, the Supreme Court held, inter alia, that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi* v. *New Jersey*, supra, 490. In *Alleyene*, the court reaffirmed its *Apprendi* holding and clarified that "[a]ny fact that, by law, increases the penalty for a crime is an 'element' that must be submitted to the jury and found beyond a reasonable doubt." *Alleyene* v. *United States*, supra, 2155. Thus, the defendant argues, given that the sentencing portion of § 53-21 (a) (2) enhances punishment for the offense by imposing a mandatory minimum five year sentence when the victim is under thirteen years of age, this fact should have been found beyond a reasonable doubt by the jury.

We agree with the state inasmuch as it argues that any error in this regard is harmless. In *Washington* v. *Recuenco*, 548 U.S. 212, 221–22, 126 S. Ct. 2546, 165 L. Ed. 2d 466 (2006), the Supreme Court held, inter alia, that the failure to submit a sentencing factor to the jury is subject to harmless error analysis. See *State* v. *Fagan*, 280 Conn. 69, 101 n.23, 905 A.2d 1101 (2006), cert. denied, 549 U.S. 1269, 127 S. Ct. 1491, 167 L. Ed. 2d 236 (2007). It is undisputed that the victim was born on October 24, 2000. Given that the defendant's trial occurred on several days in May, 2012, when the victim was eleven years old, we conclude that the jury could have found beyond a reasonable doubt that all of the instances of the defendant's offensive conduct against the victim occurred while the victim was under thirteen years of age. As a result, we reject the defendant's argument and conclude that any alleged error of the court in not instructing the jury to find beyond a reasonable doubt that the victim was under thirteen years of age when the defendant violated § 53-21 (a) (2) was harmless beyond a reasonable doubt.

### III

Finally, we address the defendant's claim that the court committed reversible error by admitting unduly prejudicial uncharged misconduct evidence against the defendant. The following additional facts and procedural history are relevant to this claim. On March 2, 2012, the victim testified during direct examination by the state as follows:

"[The Prosecutor]: . . . Sometimes at home, do you

still get into trouble for things?

"[The Victim]: Yes.

"[The Prosecutor]: For acting out?

"[The Victim]: Yes.

"[The Prosecutor]: Okay. Do you sometimes tell lies about things you do?

"[The Victim]: Yes, I do.

"[The Prosecutor]: You do. And have you ever taken things that aren't yours?

"[The Victim]: Yes.

"[The Prosecutor]: Okay. Did you take an iPod?

"[The Victim]: Yes.

"[The Prosecutor]: Tell me about that . . . do you know why you take something?

"[The Victim]: I, like, I just have, like, a feeling that every time I, like, see something, I have to take it.

"[The Prosecutor]: Okay. Do you know if it's right or it's wrong to take something?

"[The Victim]: It's wrong.

"[The Prosecutor]: And if somebody asks you about something you did, are there ever times that you don't fess up, you don't say what really happened?

"[The Victim]: Yes.

"[The Prosecutor]: And what makes you not tell the truth then?

"[The Victim]: Because I don't want to get in trouble.

"[The Prosecutor]: Okay. Today, when we come here, it's, obviously, a really important place where we have to tell the truth, do you understand that?

"[The Victim]: Yes.

"[The Prosecutor]: Okay. And when I asked you questions today, you know how important it is that you tell the truth of how you remember things?

"[The Victim]: Yes, I do.

"[The Prosecutor]: Have you told the truth?

"[The Victim]: Yes, I do—I have."

While the victim was being cross-examined, he testified as follows:

"[Defense Counsel]: Now, recently, you've talked to your therapist?

"[The Victim]: Yes.

"[Defense Counsel]: And you've had little problems of saying the truth?

"[The Victim]: Yes.

"[Defense Counsel]: And you keep saying, you know, different things to different people?

"[The Victim]: Yes.

"[Defense Counsel]: And so, you tend to lie a lot?

"[The Victim]: Yes.

"[Defense Counsel]: But you are not lying today?

"[The Victim]: I'm not lying today.

"[Defense Counsel]: You didn't lie prior to all these incidents happening?

"[The Victim]: No.

"[Defense Counsel]: [C] didn't tell you to lie?

"[The Victim]: No, she did not.

"[Defense Counsel]: [C] didn't promise you anything?

"[The Victim]: She promised she would keep me safe.

"[Defense Counsel]: Okay. And you also had a little problem with stealing?

"[The Victim]: Yes.

"[Defense Counsel]: And you've been stealing quite a bit?

"[The Victim]: Yes."

On May 7, 2012, the state notified the defendant and the court that it intended to introduce evidence of other crimes, wrongs, or acts of the defendant through, inter alia, the testimony of the victim's half-sister, M, whose biological mother was also the defendant, with respect to her overhearing the defendant ask the victim to steal money from his biological father, F, and to bring it to the defendant so that she could use it to purchase items for the victim. The state argued that this evidence was relevant because it was "a matter of impeachment" for the victim, given that he had testified that he occasionally tells lies and steals. The court did not rule on the issue on that date, but the videotaped testimony of the victim, in which he testified that he lies and steals at times, subsequently was played before the jury.

On May 8, 2012, the defendant filed a written objection to the state's notice of intent and an accompanying memorandum of law, in which she objected to the state's introduction of the uncharged misconduct evidence on the grounds that its probative value was outweighed by its unfairly prejudicial effect, and that it subjected her to unfair surprise. On this same date, the court ruled that the evidence presented through M's testimony was admissible, as follows:

"There was filed yesterday by motions . . . a notice of intent to introduce evidence. This is the state's motion of other crimes, wrongs or acts, specifically to allege relevant facts. The first one is, quote, the defen-

dant is alleged to have requested that the [victim] steal money from [F] to bring to the defendant, who, thereafter, indicated she would purchase him things with it.

"The court has already and the jury has already heard [that the victim] has admitted under oath to stealing. The court would allow the defendant to make comments, and the defendant's statements are admissible. Relevant statements are admissible. This issue of what, if anything, was stolen or her involvement in the stealing of any funds concerning [the victim] goes to weight and not admissibility, so I would allow that." On the same date, M testified that, on one occasion, she overheard the defendant ask the victim to take quarters from F so that she could buy the victim a laptop.[13] M also testified that she recalled that the victim frequently would come home with quarters.

On appeal, the defendant argues that the court erred by admitting this uncharged misconduct evidence because it was not relevant or material to the crimes with which the defendant had been charged. The defendant also argues that not only was this uncharged misconduct evidence irrelevant, but its prejudicial effect outweighed its probative value with respect to any material issue in the case. Furthermore, the defendant argues that because the state was the first party to impeach the victim, it did not need to introduce the uncharged misconduct evidence and any attempt at doing so was not only unnecessary, but unduly harmful to the defendant. We disagree with the defendant's arguments.

We begin our analysis with the appropriate standard of review for this claim. "We review the trial court's decision to admit evidence, if premised on a correct view of the law . . . for an abuse of discretion." (Internal quotation marks omitted.) *State* v. *Reynolds*, 152 Conn. App. 318, 335, 97 A.3d 999, cert. denied, 314 Conn. 934, 102 A.3d 85 (2014).

With respect to the defendant's claim that the court erred by admitting the uncharged misconduct evidence because it was irrelevant, we agree with the state that such a claim is not reviewable. "[T]he standard for the preservation of a claim alleging an improper evidentiary ruling at trial is well settled. This court is not bound to consider claims of law not made at the trial. . . . In order to preserve an evidentiary ruling for review, trial counsel must object properly. . . . In objecting to evidence, counsel must properly articulate the basis of the objection so as to apprise the trial court of the precise nature of the objection and its real purpose, in order to form an adequate basis for a reviewable ruling. . . . Once counsel states the authority and ground of [the] objection, any appeal will be limited to the ground asserted. . . .

"These requirements are not simply formalities. They

serve to alert the trial court to potential error while there is still time for the court to act. . . . Assigning error to a court's evidentiary rulings on the basis of objections never raised at trial unfairly subjects the court and the opposing party to trial by ambush." (Internal quotation marks omitted.) *State* v. *Pagan*, 158 Conn. App. 620, 632–33, 119 A.3d 1259, cert. denied, 319 Conn. 909, 123 A.3d 438 (2015). In the defendant's objection to the state's notice of intent to introduce evidence that the defendant enticed the victim to steal from F, she only objected on the grounds that the probative value of such evidence was outweighed by the danger of unfair prejudice and unfair surprise. At trial, during M's testimony, the defendant only objected to the evidence on the grounds that such evidence was hearsay and was elicited in an improper form.[14] Because the only one of these grounds stated at trial that the defendant raises on appeal is that the uncharged misconduct evidence's probative value was outweighed by its tendency to cause unfair prejudice, this is the only ground on which we shall review the defendant's claim.

The defendant argues that the prejudicial effect of this uncharged misconduct evidence unduly outweighed its probative value because, although it was introduced to rehabilitate the credibility of the victim insofar as he had testified that he sometimes lies and steals, it unnecessarily tarnished the character of the defendant, given that she is the victim's mother, and any evidence suggesting that she would entice her son to commit a crime would arouse the emotions of the jury against her. Furthermore, the defendant argues that the unfairly prejudicial effect is amplified by the fact that this evidence does not fit into any recognized exception to the admissibility of uncharged misconduct evidence as set forth in § 4-5 of the Connecticut Code of Evidence.

Section 4-5 of the Connecticut Code of Evidence, titled "Evidence of Other Crimes, Wrongs or Acts Generally Inadmissible," provides in relevant part: "(a) . . . Evidence of other crimes, wrongs or acts of a person is inadmissible to prove the bad character, propensity, or criminal tendencies of that person except as provided in subsection (b).

"(b) . . . Evidence of other sexual misconduct is admissible in a criminal case to establish that the defendant had a tendency or a propensity to engage in aberrant and compulsive sexual misconduct if: (1) the case involves aberrant and compulsive sexual misconduct; (2) the trial court finds that the evidence is relevant to a charged offense in that the other sexual misconduct is not too remote in time, was allegedly committed upon a person similar to the alleged victim, and was otherwise similar in nature and circumstances to the aberrant and compulsive sexual misconduct at issue in the case; and (3) the trial court finds that the probative value of the

evidence outweighs its prejudicial effect.

"(c) . . . Evidence of other crimes, wrongs or acts of a person is admissible for purposes other than those specified in subsection (a), such as to prove intent, identity, malice, motive, common plan or scheme, absence of mistake or accident, knowledge, a system of criminal activity, or an element of the crime, or to corroborate crucial prosecution testimony.

"(d) . . . In cases in which character or a trait of character of a person in relation to a charge, claim or defense is in issue, proof shall be made by evidence of specific instances of the person's conduct."

The official commentary to § 4-5 (c) states in relevant part: "Admissibility of other crimes, wrongs or acts evidence is contingent on satisfying the relevancy standards and balancing test set forth in Sections 4-1 and 4-3, respectively. For other crimes, wrongs or acts evidence to be admissible, the court must determine that the evidence is probative of one or more of the enumerated purposes for which it is offered, and that its probative value outweighs its prejudicial effect. . . . *The purposes enumerated in subsection (c) for which other crimes, wrongs or acts evidence may be admitted are intended to be illustrative rather than exhaustive.* Neither subsection (a) nor subsection (c) precludes a court from recognizing other appropriate purposes for which other crimes, wrongs or acts evidence may be admitted, provided the evidence is not introduced to prove a person's bad character or criminal tendencies, and the probative value of its admission is not outweighed by any of the Section 4-3 balancing factors." (Emphasis added.) Conn. Code Evid. § 4-5 (c), commentary.

In the present case, the court determined that the challenged uncharged misconduct evidence showing that the defendant told the victim to steal money from F was relevant to the issue of the victim's credibility,[15] and that its probative effect was not outweighed by the danger of unfair prejudice or surprise brought about by its admission. The victim was the state's key witness at trial and, in essence, the state's case hinged on the victim's credibility. Given that during direct and cross-examination, the victim testified that he lied and stole at times, his credibility was called into question. "Issues of credibility typically are determinative in child sexual abuse prosecutions. This is so because in sex crime cases generally, and in child molestation cases in particular, the offense often is committed surreptitiously, in the absence of any neutral witnesses." (Internal quotation marks omitted.) *State* v. *James W.*, 87 Conn. App. 494, 514, 866 A.2d 719, cert. denied, 273 Conn. 925, 871 A.2d 1032 (2005). The uncharged misconduct evidence at issue explained, only as to one specific incidence of stealing, why the victim had stolen in the past, and, given that stealing is evidence of dishonesty which can be used to impeach a witness' credibility; see *State* v.

*Swain*, 101 Conn. App. 253, 267, 921 A.2d 712, cert. denied, 283 Conn. 909, 928 A.2d 539 (2007); such explanation was a proper means of rehabilitating the credibility of the victim.

Aside from the defendant's unpreserved argument as to the relevancy of the uncharged misconduct evidence at issue, she argues that its probative value was outweighed by its prejudicial effect. Section 4-3 of the Connecticut Code of Evidence, titled "Exclusion of Evidence on Grounds of Prejudice, Confusion or Waste of Time," provides that "[r]elevant evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice or surprise, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence." "[T]he determination of whether the prejudicial impact of evidence outweighs its probative value is left to the sound discretion of the trial court judge and is subject to reversal only where an abuse of discretion is manifest or injustice appears to have been done. . . . [Our Supreme Court] has previously enumerated situations in which the potential prejudicial effect of relevant evidence would counsel its exclusion. Evidence should be excluded as unduly prejudicial: (1) where it may unnecessarily arouse the jury's emotions, hostility or sympathy; (2) where it may create distracting side issues; (3) where the evidence and counterproof will consume an inordinate amount of time; and (4) where one party is unfairly surprised and unprepared to meet it." (Internal quotation marks omitted.) *State* v. *Dorlette*, 146 Conn. App. 687, 691, 79 A.3d 132 (2013), cert. denied, 311 Conn. 906, 83 A.3d 607 (2014). Furthermore, with respect to a trial court's ruling on a prejudicial-probative balancing test, "[w]e will indulge in every reasonable presumption in favor of the trial court's ruling." (Internal quotation marks omitted.) *State* v. *Figueroa*, 235 Conn. 145, 162, 665 A.2d 63 (1995).

We conclude that the court properly determined that the probative value of M's testimony that she once overheard the defendant urging the victim to steal quarters from F was not outweighed by its prejudicial effect. This uncharged misconduct evidence did not tend to arouse the emotions of the jury, especially in light of the nature of the crimes with which the defendant had been charged, crimes that involved her sexual abuse of her son. The prejudicial tendency of this uncharged misconduct evidence also pales in comparison to evidence that was adduced at trial showing that the defendant had threatened to kill F and C. Thus, we conclude that the jury's emotions were not unduly aroused by the admission of evidence that she encouraged her son, the victim, to steal. The evidence also did not create a distracting side issue because it pertained to the credibility of the state's key witness, which was the essence of the state's case. Furthermore, the evidence and

counterproof of it was not consumed by an inordinate amount of time, but rather was resolved quite summarily at the beginning of two days of the trial.

Last, we are not persuaded by the defendant's argument that she was unfairly surprised by the evidence. On May 7, 2010, at the request of defense counsel, the court afforded defense counsel an opportunity to meet with M prior to her testimony on the afternoon of May 8, 2010. The record suggests that this meeting between M and defense counsel occurred and that no further objection that was based on the lack of timely notice was raised by the defendant. Accordingly, the court did not abuse its discretion in admitting the uncharged misconduct evidence.

The judgment is affirmed.

In this opinion the other judges concurred.

* In accordance with our policy of protecting the privacy interests of the victims of the crime of risk of injury to a child, we decline to use the defendant's full name or to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

[1] The victim testified that, on at least one occasion, the defendant touched his penis with both her mouth and her hands, and that on at least two occasions, the defendant touched his penis with just her hands. In total, the victim testified that on about five or more different occasions, the defendant touched his penis with either her hands, her mouth, or both her hands and her mouth.

[2] Murphy is also the associate medical director for the Yale clinic.

[3] Murphy also testified that, at the time of the medical evaluation, she was aware that the victim had been receiving therapy treatment at Clifford Beers, and that one of the purposes of her inquiry as to relevant health information with respect to the victim was to ensure that the victim was receiving appropriate therapy services.

[4] General Statutes (Supp. 2016) § 53-21 provides in relevant part: "(a) Any person who (1) wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that the life or limb of such child is endangered, the health of such child is likely to be injured or the morals of such child are likely to be impaired, or does any act likely to impair the health or morals of any such child, or (2) has contact with the intimate parts, as defined in section 53a-65, of a child under the age of sixteen years or subjects a child under sixteen years of age to contact with the intimate parts of such person, in a sexual and indecent manner likely to impair the health or morals of such child . . . shall be guilty of (A) a class C felony for a violation of subdivision (1) or (3) of this subsection, and (B) a class B felony for a violation of subdivision (2) of this subsection, except that, if the violation is of subdivision (2) of this subsection and the victim of the offense is under thirteen years of age, such person shall be sentenced to a term of imprisonment of which five years of the sentence imposed may not be suspended or reduced by the court . . . ."

We note that in 2007, § 53a-21 (a) was amended by Public Acts 2007, No. 07-143, § 4, which took effect July 1, 2007, and made a violation of subdivision (2) punishable by a term of imprisonment of which five years may not be suspended or reduced by the court when the victim is younger than thirteen years of age.

Although § 53-21 (a) has been amended several times since 2007, those amendments are not relevant to this appeal. For convenience, we refer herein to the revision codified in the 2016 supplement to the General Statutes.

[5] The state did not dispute the fact that defense counsel was not present at the forensic interview. The court then articulated its understanding of the state's position by stating that it understood the state to be arguing that "a jury in a case such as this gets to see two videos; one where there was a right to confront [the video recording of the victim's testimony at Southern Connecticut State University] and one where there was not [the video of the forensic interview with Montelli]." The state agreed with the court that this was its position.

[6] The defendant represented to this court at oral argument that she was

objecting to the admissibility of both the video recording of the forensic interview and Montelli's testimony concerning the same. We note, however, that on appeal, the defendant has not briefed the issue of the admissibility of Montelli's testimony, although she testified extensively concerning the disclosure made to her by the victim during the forensic interview. Our analysis of the defendant's claim focuses on the admissibility of the video recording of the forensic interview.

[7] The tender years exception to the hearsay rule, codified in § 8-10 of the Connecticut Code of Evidence, states the following: "Admissibility in criminal and juvenile proceedings of statement by child under thirteen relating to sexual offense or offense involving physical abuse against child. (a) Notwithstanding any other rule of evidence or provision of law, a statement by a child under thirteen years of age relating to a sexual offense committed against that child, or an offense involving physical abuse committed against that child by a person or persons who had authority or apparent authority over the child, shall be admissible in a criminal or juvenile proceeding if: (1) The court finds, in a hearing conducted outside the presence of the jury, if any, that the circumstances of the statement, including its timing and content, provide particularized guarantees of its trustworthiness, (2) the statement was not made in preparation for a legal proceeding, (3) the proponent of the statement makes known to the adverse party an intention to offer the statement and the particulars of the statement including the content of the statement, the approximate time, date and location of the statement, the person to whom the statement was made and the circumstances surrounding the statement that indicate its trustworthiness, at such time as to provide the adverse party with a fair opportunity to prepare to meet it, and (4) either (A) the child testifies and is subject to cross-examination at the proceeding, or (B) the child is unavailable as a witness and (i) there is independent nontestimonial corroborative evidence of the alleged act, and (ii) the statement was made prior to the defendant's arrest or institution of juvenile proceedings in connection with the act described in the statement.

"(b) Nothing in this section shall be construed to (1) prevent the admission of any statement under another hearsay exception, (2) allow broader definitions in other hearsay exceptions for statements made by children under thirteen years of age at the time of the statement concerning any alleged act described in subsection (a) of this section than is done for other declarants, or (3) allow the admission pursuant to the residual hearsay exception of a statement described in subsection (a) of this section." (Internal quotation marks omitted.) Conn. Code Evid. § 8-10.

[8] Murphy also testified as follows with respect to the normal procedure that she follows in conducting medical evaluations of minor victims of sexual abuse: "[T]he way things have evolved and what we have been doing probably for the past ten years, most of the children seen receive an interview and a medical evaluation. So, the initial meeting is with the social worker and the person who is doing the medical evaluation with the accompanying guardian to the child to get a history about the family history and about the concern of why the child is there. After that history is obtained, the forensic interviewer will then meet with the child to do the forensic interview that is observed by myself. I do most of the medical evaluations, so, by myself or whoever is doing the medical by police and [the department]. Then, after the interview is completed is when the child typically is offered a medical evaluation. Sometimes if a medical person isn't available, we don't always do the medical on the same day. Occasionally, it's done on a different day, and then the social worker . . . meets with whoever the child is scheduled with to fill them in on the details of the forensic interview and the history. . . .

"[A]ll children are offered a medical evaluation, and there are several reasons for that. Many of the children who have talked about different things that have happened to them, whether a medical evaluation is indicated or not, sometimes they have worries about their body that they're going to share in the medical evaluation that they may not have shared within the forensic interview or with whoever else they might meet. The other reason is that there's a kind of a process to telling; some kids only tell partial information initially, and sometimes the things they may not have talked about, which may be the more embarrassing things, would necessitate a medical. So, just kind of sitting down and talking with a child about what we want to check, making sure they are okay and learning about what their understandings of things are, what they might be worried about. They may have inaccurate information about some health issue that might be related to whatever happened to them. So, kids are really relieved to have somebody

check their body and make sure everything is okay. That has been my experience with as many kids as I have seen."

[9] We conclude that the claim was adequately briefed and, therefore, disagree with the state's argument as to the reviewability of the defendant's second claim.

[10] During the sentencing hearing, the court also stated: "[T]he . . . victim . . . was born on October 24, 2000. Numerous times between the years 2006 and 2009, and that is approximate years, the defendant had sexual contact with the intimate parts of her son, namely, his penis. . . . He was seven, eight, or nine years old when this conduct of the defendant was imposed upon him."

[11] With respect to the dates of offenses alleged in an information, we note that "[t]he state has a duty to inform a defendant, within reasonable limits, of the time when the offense charged was alleged to have been committed. The state does not have a duty, however, to disclose information which the state does not have." (Internal quotation marks omitted.) *George M.* v. *Commissioner of Correction*, 101 Conn. App. 52, 59, 920 A.2d 372 (2007), rev'd on other grounds, 290 Conn. 653, 966 A.2d 179 (2009). Accordingly, the state is permitted to "[allege] a . . . date range during which the [charged] offenses were alleged to have been committed." Id. Furthermore, it is particularly reasonable for the state to allege in an information that the defendant committed offenses within a date range in cases where "the [victim is] of a tender age, there is a continuing nature to the offenses alleged and the capacity of the [victim] to recall specifics precludes the state from alleging events with exactitude." Id.

[12] Even if the evidence had disclosed that some of the acts alleged in this case had occurred prior to the July 1, 2007 amendment to § 53-21 (a) (2), our conclusion that the court did not impose an illegal sentence still would stand. In *State* v. *Ramos*, 176 Conn. 275, 407 A.2d 952 (1978), our Supreme Court noted that "[i]t is a well-established rule in this state that it is not essential in a criminal prosecution that the crime be proved to have been committed on the precise date alleged, it being competent ordinarily for the prosecution to prove the commission of the crime charged at any time prior to the date of the complaint and within the period fixed by the Statute of Limitations." (Internal quotation marks omitted.) Id., 276–77. Furthermore, this court, in *State* v. *Allen*, supra, 12 Conn. App. 403, considered a claim that the trial court improperly applied an amended sentencing statute when the state alleged that some of the criminal acts committed by the defendant, which were in violation of § 53-21, occurred before an amendment to the statutory sentencing scheme took effect. Id., 405. The state alleged in the information that the defendant, "on divers dates 1980 through March 5, 1984 . . . did commit certain acts likely to impair the health or morals of a minor child . . . ." (Internal quotation marks omitted.) Id., 404. After the defendant was found guilty, the court sentenced him pursuant to General Statutes § 53a-35a, which provided, inter alia, that any felony committed on or after July 1, 1981, would require that a definite sentence be imposed for a judgment of conviction for such felony. Id., 406. On appeal, the defendant argued that his sentence was illegal because the state had charged that he had committed offenses both prior to and after July 1, 1981, and, as a result, the court should have sentenced him pursuant to § 53a-35, which required, inter alia, that any sentence imposed for a judgment of conviction for a felony committed prior to July 1, 1981, would be an indeterminate sentence. Id., 405. This court held that although some of the criminal offenses alleged by the state occurred before July 1, 1981, the trial court did not err in imposing its sentence under the amended sentencing statute, § 53a-35a. Id., 407. Furthermore, this court stated in relevant part that "where a sentencing statute which is applicable to a continuing offense is amended during the course of the commission of that offense, and where the offense is not completed until after the effective date of the amended statute, the defendant is subject to the penalties provided by that amended statute. . . . General Statutes § 53-21 defines a crime which, depending on the facts of the case, may be a continuing offense or may be an offense which is completed upon the happening of a single event. This information was treated by the court and the parties as a continuing offense, beginning in 1980 and not ending until 1984. The court therefore was entitled to sentence the defendant, pursuant to § 53a-35a, for the continuing offense . . . ." (Citations omitted.) Id., 406–407. In the present case, we similarly conclude that the court did not err by imposing a sentence pursuant to § 53-21 (a) (2), as amended in July, 2007, because the evidence adduced at trial established that the offenses committed by the defendant, at the very least, were not completed until

after July, 2007.

[13] Although the defendant objected to M's testimony on hearsay grounds, the court properly ruled that the defendant's statement was admissible as an admission of a party. See Conn. Code Evid. § 8-3 (1).

[14] We reject the defendant's argument, made in her reply brief, that, by virtue of her objection to the admissibility of the evidence on unfair prejudice grounds, she implicitly objected to the relevance of the evidence because the exceptions set forth in § 4-5 of the Connecticut Code of Evidence require that the evidence be relevant.

[15] As previously mentioned, the defendant disputes this conclusion on appeal, yet she did not properly preserve her objection on this ground because at trial and in her written objection to the state's notice of intent to introduce evidence of other crimes, wrongs, or acts, she only objected to the admission of this evidence on different grounds, none of which challenged the relevance of this evidence as it pertained to the victim's credibility. Nevertheless, we conclude that the court properly determined that this uncharged misconduct evidence was admissible as relevant to the rehabilitation of the victim's credibility.

The commentary for § 4-5 (c) of the Connecticut Code of Evidence does not limit the purposes for which a court can admit uncharged misconduct evidence to those enumerated in that subsection of the Code. Therefore, the court was permitted to admit the uncharged misconduct evidence at issue in the present appeal to the extent that it bore on the victim's credibility, which the court determined to be a material issue in the state's case. Furthermore, we note that "[t]he state is allowed to rehabilitate a witness whose credibility has been impeached . . . by allowing that witness to explain the circumstances underlying the [the incident that was used to impeach] . . . and may rebut such evidence *by other evidence*." (Citation omitted; emphasis added.) *State* v. *Sauris*, 227 Conn. 389, 412, 631 A.2d 238 (1993), overruled in part on other grounds by *Label Systems Corp.* v. *Aghamohammadi*, 270 Conn. 291, 309, 852 A.2d 703 (2004). Such other evidence may also include the testimony of a witness such as M who is called to testify about the circumstances surrounding an event which opposing counsel used to cast doubt on the credibility of another witness. The admissibility of this evidence is not abolished simply because this type of evidence also can be characterized as uncharged misconduct evidence with respect to the defendant.

Rehabilitation also can be accomplished by testimony about the impeached witness' character for veracity: "If a witness's veracity has been attacked by proof of a reputation for untruthfulness, it can be supported by proof of the witness's reputation for truthfulness. *Smirnoff* v. *McNerney*, 112 Conn. 421, 423, 152 A. 399 (1930) [('The plaintiff introduced evidence of the conviction of [the defendant] some years before of the crime of forgery in order to attack his credibility as a witness. In rebuttal the defendant offered, and the court admitted, evidence of his reputation in the community for truth and veracity. Such evidence is not restricted, as the plaintiff claims, solely to the purpose of rebutting evidence of the same kind admitted to attack the credibility of a witness, but is admissible to support that credibility when it is attacked as here by proof of a prior conviction of crime.')]. A reputation for truth is also admissible to support a witness who has been impeached by a conviction of a crime. Id. By similar reasoning, a truthful reputation should also be admissible to rebut impeachment by misconduct evidence a lack of veracity. Id." C. Tait & E. Prescott, Connecticut Evidence (5th Ed. 2014) § 6.39.2, p. 437.