******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* GIOVANNI D.*
## (SC 20899)

Mullins, C. J., and McDonald, D'Auria, Ecker,
Alexander, Dannehy and Bright, Js.

### *Syllabus*

Convicted of sexual assault in the first degree, risk of injury to a child, and aggravated sexual assault of a minor in connection with the sexual abuse of the victim, J, the defendant appealed to this court. The defendant claimed, inter alia, that the trial court had abused its discretion in admitting into evidence certain statements that J had made during a forensic interview concerning the sexual abuse at issue under the exception to the hearsay rule for statements made for the purpose of obtaining medical diagnosis or treatment set forth in § 8-3 (5) of the Connecticut Code of Evidence (medical treatment exception). *Held*:

This court clarified that hearsay statements can be admitted under the medical treatment exception only when the declarant was motivated, at least in part, by a desire to obtain medical diagnosis or treatment and the declarant's statements were reasonably pertinent to achieving that end.

The trial court abused its discretion in admitting, under the medical treatment exception, certain statements that J had made during the forensic interview through the testimony of A, who conducted the interview, as the state failed to demonstrate that the circumstances surrounding the forensic interview would have allowed an objective observer to infer that J understood the medical purpose of the forensic interview.

The forensic interview occurred at a child advocacy center rather than a medical facility, there was no indication that the interview setting would have alerted J to the medical nature of the interview, the record was silent as to any representations that A had made to J regarding the nature of the interview and was limited as to the specific questions that A asked J, the record also was silent as to whether J discussed any physical or mental health concerns during the interview, and the timing of the interview, at least ten months after the last instance of abuse and five months after J's

---

* In accordance with our policy of protecting the privacy interests of the victims of sexual abuse and the crime of risk of injury to a child, we decline to use the defendant's full name or to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

Moreover, in accordance with federal law; see 18 U.S.C. § 2265 (d) (3) (2024); we decline to identify any person protected or sought to be protected under a protection order, protective order, or a restraining order that was issued or applied for, or others through whom that person's identity may be ascertained.

initial disclosure of the abuse, weighed against an inference that J understood that the purpose of the forensic interview was medical in nature.

This court nevertheless concluded that the trial court's error in admitting J's statements through A's testimony was harmless because this court had a fair assurance that, under the circumstances of this case, this evidence did not substantially affect the jury's verdict.

Specifically, the challenged evidence did not present any new material to the jury regarding the specific instances of abuse, and the prosecutor did not emphasize A's testimony during closing argument but, rather, relied on a limited portion of it that was not challenged on appeal.

The trial court did not abuse its discretion in denying the defendant's request to provide the jury with a special child credibility instruction concerning J's testimony.

J was twelve years old at the time of the trial, which is an age that, in itself, does not generally warrant a special credibility instruction, and the defendant conceded that J was a competent witness and that she understood the concept of truthfulness.

Moreover, this court declined the defendant's request to exercise its supervisory authority over the administration of justice and to modify its approach to special child credibility instructions as set forth in *State* v. *James* (211 Conn. 555).

Argued September 18—officially released December 9, 2025

*Procedural History*

Substitute information charging the defendant with two counts each of the crimes of sexual assault in the first degree and risk of injury to a child, and one count of the crime of aggravated sexual assault of a minor, brought to the Superior Court in the judicial district of New Britain and tried to the jury before *Baldini, J.*; verdict and judgment of guilty, from which the defendant appealed to this court. *Affirmed.*

*Kevin M. Black, Jr.*, assigned counsel, for the appellant (defendant).

*Nathan J. Buchok*, assistant state's attorney, with whom, on the brief, were *Christian M. Watson*, state's attorney, *Helen McLellan*, supervisory assistant state's

attorney, and *David Clifton*, senior assistant state's attorney, for the appellee (state).

*Opinion*

ALEXANDER, J. In this appeal, we clarify the standard for the admissibility of statements made by a child during a forensic interview under the medical diagnosis and treatment exception to the hearsay rule set forth in § 8-3 (5) of the Connecticut Code of Evidence (medical treatment exception). The defendant, Giovanni D., appeals from the judgment of conviction, rendered after a jury trial, of various sexual offenses against the minor victim, J. On appeal, the defendant claims that the trial court abused its discretion in (1) admitting into evidence certain statements made by J to a forensic interviewer under the medical treatment exception, and (2) denying his request for a special child witness credibility instruction. Although we agree with the defendant's first claim that the trial court abused its discretion in admitting certain statements under the medical treatment exception, we conclude that the error was harmless. We are not persuaded by his second claim. Accordingly, we affirm the judgment of conviction.

The jury reasonably could have found the following facts. When J was between the ages of five and ten years old, she resided in New Britain with the defendant and her mother, D. The defendant and D were in a long-term romantic relationship, and J considered the defendant to be her father. During this time period, the defendant sexually abused J on multiple occasions when watching her and her younger brother while D was at work outside of the home. The acts of abuse included anal intercourse, fellatio, and having J masturbate him. In addition to those acts, the defendant also choked J, slapped her, pulled her hair, and threatened to kill her.

In July, 2020, the defendant and D had a domestic dispute that resulted in the defendant's incarceration and the termination of their romantic relationship. After that arrest, there was no contact between J and the defendant. In December, 2020, J disclosed to D, without providing specific details, that the defendant used to "touch" her. At the time of this disclosure, the defendant was still incarcerated. For this reason, among others, D believed that the defendant was not a present threat to J and waited until she learned of his release in April, 2021, to report the allegations to the New Britain Police Department. Detective Lisa Steeves was assigned to the case and, as part of her investigation, arranged for the Klingberg Children's Advocacy Center (Klingberg) in Hartford to conduct a forensic interview of J.

On May 12, 2021, Nishka Ayala, a trained forensic interviewer, met with J at Klingberg. On June 15, 2021, Nina Livingston, a pediatrician at the Connecticut Children's Medical Center specializing in child abuse, conducted a medical examination of J.[1] To inform her examination, Livingston relied on a report from Ayala's forensic interview to obtain the relevant history of the abuse. The results of the physical examination were normal; Livingston testified that they neither proved nor dis-proved the sexual abuse allegations.

The state charged the defendant with two counts each of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (2) and risk of injury to a child in violation of General Statutes § 53-21 (a) (2), and with one count of aggravated sexual assault of a minor in violation of General Statutes § 53a-70c (a) (3). The case was tried to a jury, which returned a verdict of guilty on all counts. The trial court rendered judgment in accordance with the jury's verdict and sen-

---

[1] J had also been referred for trauma therapy.

tenced the defendant to a total effective term of forty-three years of imprisonment, followed by sixteen years of special parole and lifetime sex offender registration. This direct appeal followed. See General Statutes § 51-199 (b) (3).

I

The defendant first claims that the trial court abused its discretion in admitting into evidence J's forensic interview statements through the testimony of Ayala.[2] We agree with the defendant that the trial court abused its discretion in admitting Ayala's testimony under the medical treatment exception, but we nevertheless conclude that the error was harmless and does not require reversal.

A

The record reveals the following additional relevant facts and procedural history. Ayala conducted J's forensic interview in accordance with the statutorily prescribed multidisciplinary team approach. See General Statutes § 17a-106a. Multidisciplinary teams "work collaboratively to investigate and treat cases of reported [child] sexual abuse." *State* v. *Maguire*, 310 Conn. 535, 543, 78 A.3d 828 (2013); see General Statutes § 17a-106a (c). To facilitate the multidisciplinary team's dual investigatory and treatment responsibilities, a forensic interview is often conducted to "solicit information [from the victim] in an unbiased, fact-finding manner that is culturally sensitive and appropriate for each child's developmental stage . . . ." General Statutes § 17a-106a (e) (4) (C). As Ayala and Livingston testified

---

[2] The state argues that the defendant did not preserve this claim for appellate review. We disagree. The record demonstrates that defense counsel objected at trial to the admission of Ayala's testimony and "articulate[d] the basis of the objection so as to apprise the trial court of the precise nature of the objection and its real purpose . . . ." (Internal quotation marks omitted.) *State* v. *Edwards*, 334 Conn. 688, 703, 224 A.3d 504 (2020).

at trial, a primary purpose of the forensic interview is to minimize the number of times a child victim, like J, is potentially retraumatized by having to recount his or her abuse to multiple providers. See, e.g., *State* v. *Manuel T.*, 337 Conn. 429, 438 n.9, 254 A.3d 278 (2020).

At the time of her forensic interview at Klingberg, J was eleven years old. The interview was video-recorded. Bethany Siedlik, a representative of the Department of Children and Families (department), observed the interview through a one-way mirror, and Steeves listened to it via telephone. During the interview, J disclosed details of the defendant's sexual abuse and also reported instances of physical and emotional abuse. To clarify the age appropriate terms J used to describe the acts, Ayala asked her to identify body parts on an anatomical drawing.

At trial, the state called Ayala to testify regarding her forensic interview of J. The video recording of the interview was not introduced. During direct examination, the prosecutor asked Ayala whether J had identified "specific acts of abuse [during her interview]?" Defense counsel objected on hearsay grounds, and the prosecutor argued that Ayala's statements were admissible under the medical treatment exception. The prosecutor cited *State* v. *Griswold*, 160 Conn. App. 528, 127 A.3d 189, cert. denied, 320 Conn. 907, 128 A.3d 952 (2015), and *State* v. *Hickey*, 135 Conn. App. 532, 43 A.3d 701, cert. denied, 306 Conn. 901, 52 A.3d 728 (2012), arguing that "part of [the forensic interview] process is . . . for medical and treatment purposes." The prosecutor contended that Ayala established the requisite medical purpose when she testified that forensic interviews "identify . . . if any [medical] services were necessary . . . ." In response, defense counsel argued that the forensic interview of J neither served a medical purpose nor was conducted by a medical professional. The trial court overruled defense counsel's objection

and instructed the prosecutor to lay further foundation "indicat[ing] that [the interview] was in the course of . . . the medical and diagnostic treatment of [J]" before inquiring again.

Ayala then testified that one purpose of a forensic interview is to make medical and mental health referrals, when necessary. She also indicated that "forensic interviewers typically ask the child if they have any worries or concerns about their body" and that medical providers rely on the forensic interview report to inform their subsequent treatment plan. Ayala went on to describe J's interview statements about the specific instances of abuse as follows: "[J] identified penile to anal penetration [and] that . . . [the defendant] . . . had her put her hands around his penis and moved them up and down . . . . She also . . . described penile to oral penetration. . . . She said it happened . . . multiple times."

\* \* \*

"[J] described being threatened . . . having her hair pulled and being choked . . . and that she couldn't breathe. . . . [W]hen I say threatened . . . she was threatened that if she told someone . . . [the defendant] would kill her." Ayala further told the jury about J's statements with respect to the frequency, location, and time frame of the abuse.

### B

A trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. See, e.g., *State* v. *Samuel U.*, 348 Conn. 304, 317, 303 A.3d 1175 (2023). "In determining whether there has been an abuse of discretion, every reasonable presumption should be made in favor of the correctness of the trial court's ruling, and we will upset that ruling only for a manifest abuse of discretion. . . .

In determining whether there has been an abuse of discretion, the ultimate issue is whether the [trial] court could reasonably conclude as it did." (Citation omitted; internal quotation marks omitted.) Id.

Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. See, e.g., *State* v. *Carrion*, 313 Conn. 823, 837, 100 A.3d 361 (2014). Unless an exception applies, hearsay is generally inadmissible. See, e.g., id.; see also Conn. Code Evid. § 8-2 (a). The medical treatment exception excludes from the hearsay rule "statement[s] made for purposes of obtaining a medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof, insofar as reasonably pertinent to the medical diagnosis or treatment." Conn. Code Evid. § 8-3 (5). The rationale behind this exception is that "the patient's desire to recover his health . . . will restrain him from giving inaccurate statements to [those who] advise or treat him." (Internal quotation marks omitted.) *State* v. *Cruz*, 260 Conn. 1, 7, 792 A.2d 823 (2002).

Hearsay statements are admissible under the medical treatment exception when a two-pronged test is satisfied: (1) the declarant was motivated by a desire to obtain medical diagnosis or treatment; and (2) the declarant's "statements were reasonably pertinent to achieving that end." (Internal quotation marks omitted.) *State* v. *Manuel T.*, supra, 337 Conn. 434. The first prong "turns . . . on the *declarant's* state of mind and . . . purpose" when making the statements; (emphasis added) *State* v. *Roy D. L.*, 339 Conn. 820, 831, 262 A.3d 712 (2021); and the second prong turns on the relevance of each statement to the provision of medical care. See *State* v. *Cruz*, supra, 260 Conn. 6.

This court and the Appellate Court have employed this two-pronged test on many occasions to determine

the admissibility of statements made by a child declarant during a forensic interview under the medical treatment exception.[3] We have not, however, always drawn a clear distinction between the two prongs.[4] We therefore take this opportunity to clarify the application of the test.

To satisfy the first prong (purpose prong), the declarant's statement must be motivated, at least in part, by the declarant's desire to obtain medical diagnosis or treatment.[5] See, e.g., *State* v. *Roy D. L.*, supra, 339 Conn.

---

[3] In the present case, we focus on the application of the medical treatment exception to forensic interviews of child sexual abuse victims. This context is narrow. We acknowledge that the medical treatment exception will often apply under other, potentially more straightforward, circumstances. See, e.g., *State* v. *Slater*, 285 Conn. 162, 185–86, 939 A.2d 1105 (medical treatment exception applied to statements made by victim to nurse and physician in hospital emergency room), cert. denied, 553 U.S. 1085, 128 S. Ct. 2885, 171 L. Ed. 2d 822 (2008); *State* v. *Errol J.*, 199 Conn. App. 800, 811–15, 237 A.3d 747 (medical treatment exception applied to medical records and statements made by victim to medical professionals who had treated him at health center), cert. denied, 335 Conn. 962, 239 A.3d 1213 (2020); *State* v. *Serrano*, 123 Conn. App. 530, 538–40, 1 A.3d 1277 (2010) (medical treatment exception applied to statements made by victim to surgeon who had treated him), cert. denied, 300 Conn. 909, 12 A.3d 1005 (2011); *State* v. *Williams*, 65 Conn. App. 449, 460–63, 783 A.2d 53 (medical treatment exception applied to statements made by child victim to nurse practitioner during medical examination at clinic), cert. denied, 258 Conn. 927, 783 A.2d 1032 (2001).

[4] See, e.g., *State* v. *Roy D. L.*, supra, 339 Conn. 827–36; *State* v. *Manuel T.*, supra, 337 Conn. 436–48; *State* v. *Arroyo*, 284 Conn. 597, 635–36 n.23, 935 A.2d 975 (2007); *State* v. *Dionne*, 207 Conn. App. 106, 114–18, 262 A.3d 961, cert. denied, 340 Conn. 910, 264 A.3d 577 (2021); *State* v. *Freddy T.*, 200 Conn. App. 577, 589–98, 241 A.3d 173 (2020); *State* v. *Ezequiel R. R.*, 184 Conn. App. 55, 61–71, 194 A.3d 873, cert. granted, 330 Conn. 945, 196 A.3d 804 (2018) (appeal dismissed February 15, 2019); *State* v. *Abraham*, 181 Conn. App. 703, 710–16, 187 A.3d 445, cert. denied, 329 Conn. 908, 186 A.3d 12 (2018); *State* v. *Griswold*, supra, 160 Conn. App. 550–58; *State* v. *Telford*, 108 Conn. App. 435, 441–45, 948 A.2d 350, cert. denied, 289 Conn. 905, 957 A.2d 875 (2008).

[5] The analogous hearsay exceptions of some other states, such as Maryland and North Carolina, require different degrees of purpose from the declarant or the interviewer. See, e.g., *Webster* v. *State*, 151 Md. App. 527, 537, 827 A.2d 910 (2003) ("[C]ourts must separately examine both the reason that a medical provider asked the sexual assault victim to describe the assault, and the victim's subjective purpose in making the statement. . . . Only

831. This rule ensures the inherent reliability and trustworthiness of the hearsay statements because the law presumes that "the patient has an incentive to tell the truth in order to obtain . . . proper medical [care]." (Internal quotation marks omitted.) *State* v. *Donald M.*, 113 Conn. App. 63, 70, 966 A.2d 266, cert. denied, 291 Conn. 910, 969 A.2d 174 (2009). Importantly, obtaining medical diagnosis or treatment does not have to be the *primary* purpose of the declarant's statement; *State* v. *Manuel T.*, supra, 337 Conn. 440–41 n.12; and, thus, the presence of investigators or other nonmedical personnel during the forensic interview does not preclude admission under the medical treatment exception. See *State* v. *Cruz*, supra, 260 Conn. 12–14; *State* v. *Miller*, 121 Conn. App. 775, 783, 998 A.2d 170, cert. denied, 298 Conn. 902, 3 A.3d 72 (2010).

To determine whether the purpose prong is satisfied in cases involving forensic interviews of children, we look to whether "the surrounding circumstances could lead an objective observer to reasonably infer" that the child, as declarant, understood the interview to have a medical purpose. (Internal quotation marks omitted.) *State* v. *Roy D. L.*, supra, 339 Conn. 834; see *State* v. *Freddy T.*, 200 Conn. App. 577, 597, 241 A.3d 173 (2020). The objective "inquiry [under the purpose prong] must be restricted to the circumstances that could be perceived by the declarant . . . ." (Internal quotation marks omitted.) *State* v. *Freddy T.*, supra, 592. Accordingly, testimony establishing the medical purpose and protocol of a forensic interview from the vantage point

statements that are both *taken and given* in contemplation of medical treatment or medical diagnosis for treatment purposes fit within the . . . hearsay exception." (Citation omitted; emphasis in original.)); *State* v. *Hinnant*, 351 N.C. 277, 287, 523 S.E.2d 663 (2000) ("the proponent of [the] testimony must affirmatively establish that the declarant had the requisite intent by demonstrating that the declarant made the statements *understanding that they would lead* to medical diagnosis or treatment" (emphasis added)).

of the interviewer or by statute generally[6] does not satisfy the purpose prong in the absence of a showing that an objective observer could reasonably infer that the *declarant* understood that medical purpose at the time he or she made the statements at issue. See, e.g., *State* v. *Manuel T.*, supra, 337 Conn. 447 ("[T]he medical treatment exception focuses on the declarant's purpose in making individual statements. . . . [B]ecause the focus of the . . . exception is the declarant's understanding of the purpose of the interview, the inquiry must be restricted to the circumstances that could be perceived by the declarant, as opposed to the motivations and intentions of the interviewer that were not apparent to the declarant." (Citation omitted; internal quotation marks omitted.)); see also *United States* v. *Kootswatewa*, 893 F.3d 1127, 1133 (9th Cir. 2018) ("[t]he declarant herself must understand that she is providing information for purposes of diagnosis or treatment because that understanding is what provides assurance that the statements are particularly likely to be truthful").

A variety of factors may inform whether this inference can reasonably be drawn. These include but are not limited to (1) the communications with the child and circumstances leading up to the interview, (2) the setting of the interview, (3) the substance of the declarant's statements, (4) the substance of the interviewer's statements and questions, and (5) the temporal proximity of the interview to the alleged acts of sexual abuse,

---

[6] We recognize that the statutory scheme governing the multidisciplinary team approach expressly contemplates the medical purpose of forensic interviews. See General Statutes § 17a-106a (e) (5) (describing one purpose of multidisciplinary team as "providing specialized medical evaluation and treatment, mental health services and support and advocacy services to children . . . and referral to other appropriate providers of such services"). The state, however, cannot rely on the statutory purpose of the interview to satisfy the purpose prong without evidence that the child understood that purpose.

the disclosure of the abuse, and the provision of medical care. See, e.g., *State* v. *Roy D. L.*, supra, 339 Conn. 834–35 (hospital location of interview, interviewer's questions regarding victim's physical and mental health, and victim's complaints of pain supported inference that child understood medical purpose of interview); *State* v. *Ezequiel R. R.*, 184 Conn. App. 55, 68, 194 A.3d 873 (purpose prong was satisfied when interview took place in hospital and interviewers told victim that their conversation would be recorded "in case . . . the doctor had any questions"), cert. granted, 330 Conn. 945, 196 A.3d 804 (2018) (appeal dismissed February 15, 2019); *State* v. *Abraham*, 181 Conn. App. 703, 713–14, 187 A.3d 445 (purpose prong was satisfied when interview was conducted in hospital and "victim . . . was asked whether she had any worries or any problems with any part of [her] body" and "to identify, on an anatomical diagram, the body parts with which the defendant had had contact" (internal quotation marks omitted)), cert. denied, 329 Conn. 908, 186 A.3d 12 (2018); *State* v. *Donald M.*, supra, 113 Conn. App. 71 (fact that referring party told child that "she would be meeting with someone at the hospital who would help her . . . and determine whether she needed therapy or other medical treatment" supported inference that child "was aware of the medical purpose of the interview").

The Appellate Court's decision in *State* v. *Freddy T.*, supra, 200 Conn. App. 577, illustrates an apt application of the purpose prong. In that case, the state argued that the purpose prong was satisfied because the forensic interviewer had asked the child questions about the alleged sexual assault and collected information for a medical referral. Id., 593. The Appellate Court disagreed and concluded that the subsequent referrals did not satisfy the purpose prong because "[t]he test . . . is what the declarant understands, not what the interview-

er's motivation is." Id., 594. The fact that a medical referral is made *after* an interview does not—without more—establish that the child understood *during* the interview that his or her statements were made to inform medical treatment.[7] See id., 593–94. The Appellate Court reasoned that the record did not show that the child's statements were motivated by a desire to obtain medical treatment because the child made no physical or emotional complaints during the interview, the medical content of the interview was "de minimis," and, by the time of the interview, the child had already received medical care addressing any health concerns. See id., 593–96.

Turning to the second prong (pertinence prong) of the admissibility test, we note that the declarant's statements must be "pertinent to the [medical] diagnosis or treatment sought." *State* v. *Cruz*, supra, 260 Conn. 6. "The term medical encompasses psychological as well as somatic illnesses and conditions"; (internal quotation marks omitted) *State* v. *Estrella J.C.*, 169 Conn. App. 56, 75, 148 A.3d 594 (2016); and, in sexual assault cases, "[statements] pertaining to the identity of the defendant and the nature of the sexual assault [are] . . . pertinent to proper diagnosis and treatment of the resulting physical and psychological injuries . . . ." *State* v. *Kelly*, 256 Conn. 23, 45, 770 A.2d 908 (2001). Similar to the purpose prong, statements may be pertinent to medical treatment even if the primary relevance of the statements was not strictly medical in nature. See *State* v. *Griswold*, supra, 160 Conn. App. 552–53. Moreover, "[s]tatements made by a sexual assault complainant to a social worker may fall within the [medical treatment] exception if the

---

[7] Age appropriate messaging at the *outset* of the interview advising the declarant of its medical goals may aid in satisfying the purpose prong. But cf. *State* v. *Freddy T.*, supra, 200 Conn. App. 593 (" 'brief safety messages' " conveyed to child *at end of interview* did not support inference that child understood interview to have medical purpose).

social worker is found to have been acting within the chain of medical care." *State* v. *Donald M.*, supra, 113 Conn. App. 71. An interviewer is within the chain of medical care if he or she has "significant interaction and cooperation with the medical care provider in the victim's case . . . ." *State* v. *Arroyo*, 284 Conn. 597, 635–36 n.23, 935 A.2d 975 (2007).

Whether a medical referral is made following a forensic interview is relevant to the pertinence prong. For example, in *Freddy T.*, the Appellate Court disagreed with the state's argument that the *purpose* prong was satisfied because the interviewer made a medical referral. *State* v. *Freddy T.*, supra, 200 Conn. App. 593–94. Had the purpose prong been satisfied in that case, the subsequent medical referral could have been used to establish that the victim's forensic interview statements were pertinent to medical diagnosis or treatment. Additionally, in determining whether the pertinence prong is satisfied, courts may consider whether a medical provider relied on the statements obtained during the interview to inform the course of treatment.

Finally, the application of the medical treatment exception need not involve an all-or-nothing approach to admissibility. See *State* v. *Manuel T.*, supra, 337 Conn. 448; see also *State* v. *Roy D. L.*, supra, 339 Conn. 830 n.7 ("the medical treatment exception . . . does not preclude a party from objecting to portions of [forensic interview] statements . . . that are . . . inadmissible for the purpose they are offered"). Although the purpose prong will often require a more holistic and contextual analysis as to whether the child understood the interview's purpose, the pertinence prong presents a narrower inquiry for courts. See *State* v. *Manuel T.*, supra, 448. We emphasize, however, that "the medical treatment exception . . . does not preclude a party from objecting to portions of statements made during forensic interviews that are . . . otherwise unduly

prejudicial. Under such circumstances, the court, particularly during a jury trial, may exercise its discretion to redact portions of a forensic interview." *State* v. *Roy D. L.*, supra, 830 n.7.

Applying these principles to the present case, we conclude that the trial court abused its discretion in admitting Ayala's testimony relaying J's forensic interview statements under the medical treatment exception because the state failed to demonstrate that the circumstances surrounding the forensic interview would allow an objective observer to infer that J understood its medical purpose.[8] First, J was not interviewed in a setting that would, without more, alert a child to the medical nature of the interview. Unlike in other cases in which the forensic interview took place at a hospital or some other facility obviously dedicated to providing medical services; see, e.g., *State* v. *Roy D. L.*, supra, 339 Conn. 834–35; *State* v. *Arroyo*, supra, 284 Conn. 625; J was interviewed in an observation room at Klingberg, which is a children's advocacy center. There is no evidence that the interview setting at Klingberg would have suggested to J that it was a medical facility. Nor was there any evidence that J was appraised of Klingberg's role in providing specialized medical referrals.

Second, the record is silent with respect to any representations Ayala made to J regarding the nature of the interview and is limited with respect to the specific questions Ayala asked J during the interview. See, e.g., *State* v. *Freddy T.*, supra, 200 Conn. App. 593. In *Roy D.*

---

[8] We note that the trial court's focus, echoed by the state in its appellate brief, on whether the *interview* itself had a medical purpose, particularly when the court requested further foundation that "[the interview] was in the course of . . . medical and diagnostic treatment," was certainly relevant to the pertinence prong but did not address the purpose prong as we have clarified it. In determining whether the purpose prong is satisfied, the focus is on the purpose of the interview as understood by the declarant. See, e.g., *State* v. *Freddy T.*, supra, 200 Conn. App. 594.

*L.*, this court upheld the admission of forensic interview statements under the medical treatment exception when the interviewer introduced herself to the victim as someone who "work[ed] for the hospital" and then explained that "people who[m] [she] work[s] with were observing the interview because they want to make sure that [children's] bodies are okay and that [the children are] okay . . . ." (Internal quotation marks omitted.) *State* v. *Roy D. L.*, supra, 339 Conn. 835; see id. ("[d]uring the course of the interview, [the interviewer] asked [the victim] about her physical and mental well-being"). Unlike in *Roy D. L.*, the record in the present case does not reveal how Ayala introduced herself to J, whether she explained to J that part of the purpose of the interview was to get information so J could receive the appropriate medical treatment, whether she asked J any questions about her physical or mental health, or whether she otherwise made statements or inquiries that would support a reasonable inference that J understood the medical purpose of the interview.[9]

Third, the record is silent as to whether J discussed any physical or mental health concerns during the interview. Cf., e.g., *State* v. *Roy D. L.*, supra, 339 Conn. 828 (victim told forensic interviewer that abuse caused her physical pain and made her uncomfortable); *State* v. *Dollinger*, 20 Conn. App. 530, 536, 568 A.2d 1058 ("[child's] complaints of pain, coupled with the physical manifestations of injury could have led the doctor . . . to conclude that the child was aware of her discomfort and her need for medical attention"), cert. denied, 215 Conn. 805, 574 A.2d 220 (1990). Although J testified *at trial*

---

[9] Ayala testified that "forensic interviewers *typically* ask the child if they have any worries or concerns about their body." (Emphasis added.) The state contends that this testimony supports an inference that J understood the interview's medical purpose. Our inquiry under the purpose prong is limited to the circumstances perceived by the declarant, and we decline to presume that an interviewer's "typical" practice was carried out in the present case for purposes of establishing that understanding on the part of J.

that the abuse "hurt" and made her feel "[s]cared," this testimony was almost two years after the forensic interview. This testimony may reflect on J's physical and mental condition while the abuse was occurring, but it does not indicate whether she understood that there was a medical purpose for her interview. There is no evidence that J articulated these same complaints to Ayala during the interview, which precludes us from inferring that J's statements were made for the purpose of obtaining medical treatment.[10]

In addition, the timing of the forensic interview weighs against an inference that J understood the interview's purpose to be medical. See *State* v. *Freddy T.*, supra, 200 Conn. App. 594–95. J first disclosed the sexual abuse to D at least five months after her final contact with the defendant.[11] Approximately four months later, D reported the abuse to the police. Ayala did not interview J until thirteen days following the police report. Given that at least ten months had passed since the last instance of abuse and five months since her initial disclosure, we cannot infer from timing alone that J would have understood that her interview statements were made for a medical purpose. See *State* v. *Estrella J.C.*, supra, 169 Conn. App. 77 ("the timing and context of the forensic interview in relation to the victim's other visits to medical professionals supported the conclu-

---

[10] In *State* v. *Telford*, 108 Conn. App. 435, 948 A.2d 350, cert. denied, 289 Conn. 905, 957 A.2d 875 (2008), the Appellate Court used the child's trial testimony that she felt " 'upset,' 'mad,' and 'scared' " to support the inference that she understood that her forensic interview had a medical purpose. Id., 443. The court's decision does not indicate whether these same complaints were expressed during the child's interview. We disagree with *Telford* to the extent that it stands for the proposition that a child's *trial* testimony concerning his or her physical and mental health, without evidence that those complaints were made during the interview, supports a finding of medical purpose.

[11] The last time J saw the defendant was in July, 2020, and her forensic interview statements indicated that the last instance of abuse was before that date.

sion that the interview was . . . reasonably pertinent to obtaining medical treatment"). Indeed, Livingston testified at trial that child sexual abuse victims often heal quickly from physical injuries and that this may have been the case for J. Furthermore, D brought J to the police because she was concerned that the defendant, who had recently been released from prison, might pose a threat to J, rather than for the purpose of obtaining medical treatment.

The state argues that Ayala's use of anatomical drawings as a clarification aid during the forensic interview supports a finding of medical purpose. Although the use of anatomical drawings and diagrams may signal a medical purpose to a child in some contexts, that circumstance alone cannot carry the inference. See, e.g., *State* v. *Estrella J.C.*, supra, 169 Conn. App. 62 (noting that victim had explained abuse using anatomical diagrams and dolls in assessing forensic interview statements under medical treatment exception); *State* v. *Telford*, 108 Conn. App. 435, 443, 948 A.2d 350 (forensic interviewer's use of exhibit of female body diagram, among other things, established that child's statements were admissible under medical treatment exception), cert. denied, 289 Conn. 905, 957 A.2d 875 (2008). Ayala testified that she used an anatomical drawing of a *male* body during the interview to help J articulate which body parts were involved in the defendant's abuse of her. Ayala could not recall, however, whether she had used an anatomical drawing of a female body to help J explain how that abuse physically affected her health. Because the purpose prong was not satisfied, we conclude that the trial court abused its discretion by admitting into evidence J's statements during the forensic interview under the medical treatment exception.[12]

---

[12] Although the purpose prong was not satisfied, we conclude that the pertinence prong would have been satisfied, at least as to some of J's statements. Ayala was acting within the chain of medical care because she worked collaboratively with other members of the multidisciplinary team, which included medical professionals, and her interview was used to make

C

The remaining question is whether the error was harmful. See, e.g., *State* v. *Jordan*, 329 Conn. 272, 287–88, 186 A.3d 1 (2018). "[W]hether [an improper ruling] is harmless in a particular case depends [on] a number of factors, such as the importance of the [evidence] in the [defendant's] case, whether the [evidence] was cumulative, the presence or absence of evidence corroborating or contradicting the [evidence] on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the . . . evidence on the trier of fact and the result of the trial. . . . [T]he proper standard for determining whether an erroneous evidentiary ruling is harmless should be whether the jury's verdict was substantially swayed by the error. . . . Accordingly, a nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." (Internal quotation marks omitted.) *State* v. *Myers*, 352 Conn. 770, 784, 338 A.3d 1088 (2025).

Given the lack of physical evidence or eyewitnesses to the alleged abuse, the state's case was not an exceedingly strong one. See *State* v. *Fernando V.*, 331 Conn. 201, 215–216, 202 A.3d 350 (2019). It is therefore undisputed that this case turned on the credibility of J. Indeed, during closing argument, the prosecutor stated: "If you don't believe [J], then you should acquit [the

J's medical and psychological referrals for treatment. On many occasions, this court has held that social workers and forensic interviewers were within the chain of medical care, so long as the statements made to them were for a medical purpose and pertinent to that end. See, e.g., *State* v. *Arroyo*, supra, 284 Conn. 633 (social worker and forensic interviewer at sexual abuse clinic); *State* v. *Cruz*, supra, 260 Conn. 6 (social worker at hospital). Further, Livingston relied on Ayala's forensic interview report to obtain J's medical history and to inform her examination.

defendant]. . . . If you do believe her, it's your duty to convict him." In light of this, the defendant argues that Ayala's testimony was harmful to the extent that it bolstered J's credibility by repeating her allegations of sexual abuse. Although this case presents a close call, we conclude that the trial court's error was harmless.

At trial, and before the jury heard any testimony from Ayala, J testified regarding her allegations of sexual abuse, telling the jury that the defendant "had [her] move [her] hand up and down on [his penis]," that he had put his penis in her "butt" and "mouth," and that the abuse happened "more than [she could] count." J further testified about instances of physical and emotional abuse, including that the defendant had slapped her, threatened to kill her, choked her, and pulled her hair, which she explained "hurt" and made her feel "[s]cared." Ayala testified after J; the majority of her testimony discussed the process of disclosure for victims of sexual abuse, the composition and purpose of multidisciplinary teams, and the goals of forensic interviews. Ayala also testified, but only briefly, about the statements that J had made during the forensic interview. It is this limited testimony that the defendant challenges on appeal. Although this portion of Ayala's testimony reiterated some of J's previous testimony, we nevertheless have a fair assurance under the circumstances of this case that it did not substantially affect the jury's verdict.

We consider it important that the challenged testimony did not present any new material to the jury regarding the specific instances of abuse.[13] See, e.g.,

---

[13] Ayala testified that, during the forensic interview, J "described being threatened . . . having her hair pulled and being choked . . . *and that she couldn't breathe*." (Emphasis added.) J similarly testified at trial about these instances. J's trial testimony differed from Ayala's because J did not mention that she "couldn't breathe." Instead, J testified: "[The defendant] had choked [me] until I [removed my clothes]. . . . [He choked me] [a]round my neck."

During closing argument, the prosecutor did not mention the choking allegation or the fact that J could not breathe. Her focus, instead, was on

*State* v. *Gonzalez*, 272 Conn. 515, 528–29, 864 A.2d 847 (2005) (harmless error when improper testimony was cumulative of victim's earlier graphic and detailed testimony about defendant's sexual abuse). But cf. *State* v. *Fernando V.*, supra, 331 Conn. 219 (concluding that exclusion of testimony was harmful because, inter alia, it would have presented jury with new information). Rather, Ayala's discussion of J's forensic interview statements reiterated, in less detail, J's earlier testimony.[14] Although repetitious testimony in cases that turn on the complainant's credibility may be considered harmful bolstering; see, e.g., *State v. Grenier*, 257 Conn. 797, 808, 778 A.2d 159 (2001) (concluding that improper testimony that had effect of vouching for victim "struck at the heart of the central—indeed, the only—issue in the case, namely, the relative credibility of [the victim]"); we conclude that Ayala's testimony, which was both brief and underinclusive of J's testimony, did not rise to that level.

Importantly, even without Ayala's testimony, the jury would have learned of J's forensic interview statements through the unchallenged testimony of Livingston, who was also asked at trial to identify the specific instances of abuse that J had reported. Without objection, Livingston testified: "[J] reported . . . penile-oral penetration . . . penile-anal penetration . . . and making her

the "three different acts that [*J*] . . . identified in the course of her testimony," namely, penile to anal penetration, penile to oral penetration, and masturbation. (Emphasis added.) The prosecutor then emphasized to whom J identified the acts: "She identified it to [the jury]. She identified it to . . . Livingston. She identified it to . . . Ayala in terms of what happened and what she described to have occurred when she was living with [the defendant] in New Britain over the course of 2015 through . . . 2020." Because the prosecutor did not mention it during closing argument, we do not consider the isolated reference in Ayala's testimony to the fact that J could not breathe to be significant to the state's overall case.

[14] Unlike Ayala, J testified that the abuse "hurt" and made her feel "[s]cared," that the defendant made her remove her clothes, and that the abuse would stop "[w]hen the weird liquid happened."

touch his penis with her hand and move it up and down until he ejaculated." In addition to this testimony, the relevant portion of Livingston's medical report was admitted into evidence without objection following a redaction.[15] This report contained a history from the forensic interview, which included the following: "[J] identified [the defendant] and reported sexual abuse including multiple incidents with contact including penile-oral penetration, penile-anal penetration, and [the defendant] making [J] touch his penis with her hand and [move] it up and down until he ejaculated."

Additionally, in evaluating harm, we consider how the state used the improperly admitted evidence during closing argument. See, e.g., *State* v. *Ayala*, 333 Conn. 225, 235, 215 A.3d 116 (2019). "[W]e find it telling [when] the state [does] not specifically mention, and certainly [does] not emphasize, the challenged statement during its closing argument, thus diminishing the importance of the statement to the state's case." Id.; see, e.g., *State* v. *Thompson*, 266 Conn. 440, 456, 832 A.2d 626 (2003). In the present case, the prosecutor did not emphasize Ayala's testimony concerning J's forensic interview statements during closing argument but, instead, relied on a limited portion of it that is *not* challenged on appeal: "You also heard from . . . Ayala about the process of disclosure, how kids disclose, when they disclose, what can affect it." The prosecutor then explained the specific utility of this testimony to the jury, which was not to bolster J's claims but, rather, to offer context to her process of disclosure: "[*T*]*hat testimony was for*

---

[15] When the state sought to introduce Livingston's medical report, defense counsel objected, arguing that the "history" section of the report contained hearsay statements. Specifically, defense counsel, outside of the presence of the jury, contended that the report improperly included statements made by *D*, who only obtained information about the abuse from J's department social worker. The trial court then redacted a portion of the report's history section and statements made by third parties.

*the purpose of trying to give you some information to properly assess what's before you.*" (Emphasis added.)

Finally, while deliberating, the jury requested a playback of the portion of Ayala's testimony "about [multidisciplinary teams'] responsibilities and . . . who is on the team." The defendant argues that this request highlights the centrality of Ayala's testimony to the state's case. We disagree. Although a jury's request to hear evidence again indicates the significance of an issue or related evidence to the verdict; see, e.g., *State* v. *Carter*, 232 Conn. 537, 549, 656 A.2d 657 (1995); the jury's question focused on Ayala's testimony regarding the responsibilities and structure of multidisciplinary teams, which did not implicate the erroneously admitted hearsay statements. For the foregoing reasons, we conclude that Ayala'stestimony did not substantially sway the jury's verdict.

## II

The defendant's next claim is that the trial court abused its discretion in denying his request to provide the jury with a special child credibility instruction[16]

---

[16] The defendant requested the following special credibility instruction: "In weighing the testimony of a child, you should also take into consideration her youth. In certain respects, a child is more apt to err than an older person; she is apt to be more amenable to any influence or suggestion which may be made to her by an older person and particularly persons closely related to her, and may try to avoid causing such persons to be angry with her. [Their] imaginations often also mislead them; its product may take on all the semblance of actual fact, and they will relate them as such. The sanctity of the oath and the solemnity of legal proceedings may appeal to them less than to an adult. On the other hand, motives of interest and ultimate design or purpose often sway her less than they do an adult. Perhaps these suggestions by me are sufficient to indicate to you that, in weighing the testimony of a child, her youth is a factor you should not overlook, and to make clear that you should apply your own experience and knowledge of childhood. . . .

"The capacity and intelligence of a child, her understanding of the difference between truth and falsehood, and her appreciation of the duty to tell the truth and, in a general way, belief that failure to perform that obligation will result in punishment, are ingredients which you should consider in assessing the testimony of a child." (Internal quotation marks omitted.)

concerning J's testimony. Alternatively, the defendant asks this court to exercise its supervisory authority over the administration of justice to modify its approach to special child credibility instructions, as stated in *State* v. *James*, 211 Conn. 555, 570–71, 560 A.2d 426 (1989), overruled in part on other grounds by *State* v. *Douglas C.*, 345 Conn. 421, 285 A.3d 1067 (2022). We are not persuaded by the defendant's claim and decline to exercise our supervisory authority as requested.

"The general rule is that a [criminal] defendant is not entitled to an instruction singling out any of the state's witnesses and highlighting his or her possible motive for testifying falsely." (Internal quotation marks omitted.) *State* v. *Jones*, 337 Conn. 486, 495, 254 A.3d 239 (2020). "Such a cautionary comment [on] the evidence . . . is now clearly within the discretion of the trial court." (Citation omitted; internal quotation marks omitted.) *State* v. *Hayes*, 20 Conn. App. 737, 748, 570 A.2d 716, cert. denied, 215 Conn. 802, 574 A.2d 218 (1990). This rule applies with equal force to jury instructions concerning the credibility of child witnesses; see id.; and "court[s] considering whether to give a special child credibility instruction [may consider] factors [including], the child's age, corroboration of the accusations, the child's ability to recall and discuss events in the past, and the child's understanding of the concept of truthfulness." *State* v. *Ceballos*, 266 Conn. 364, 423, 832 A.2d 14 (2003), overruled in part on other grounds by *State* v. *Douglas C.*, 345 Conn. 421, 285 A.3d 1067 (2022). "[T]he lack of corroboration, beyond constancy of accusation evidence, is not dispositive." *State* v. *Ceballos*, supra, 424.

The defendant has failed to establish that the trial court's denial of his request for a special child credibility instruction was an abuse of discretion under the circumstances. J was twelve years old at the time of trial, which is an age that, in itself, does not generally warrant

a special credibility instruction. See, e.g., id., 423–24 (denial of special child credibility instruction was not abuse of discretion when child was eight years old at time of trial); *State* v. *James*, supra, 211 Conn. 570–71 (denial of special child credibility instruction was not abuse of discretion when child was twelve years old at time of trial). Additionally, the defendant concedes that J was a competent witness and that she understood the concept of truthfulness.[17] We can identify no reason, particular to this case, that would have required the trial court to give the jury the requested special child credibility instruction. We therefore decline to disturb the trial court's decision.

Alternatively, the defendant asks this court to exercise its supervisory authority to modify its approach to special child credibility instructions, as stated in *James*, and to hold that a defendant is entitled to such an instruction when the evidence establishes a particularized credibility concern for a child complainant. The defendant offers three limiting factors to his proposed rule, namely, that the case (1) is charged as a continuing course of conduct, (2) involves a delayed disclosure, and (3) has particularized trial evidence underlying a theory of suggestion.

"It is well settled that [a]ppellate courts possess an inherent supervisory authority over the administration of justice. . . . Supervisory powers are exercised to direct trial courts to adopt judicial procedures that will address matters that are of utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole. . . . Under our supervisory authority, we have adopted

---

[17] The defendant also argues that the special child credibility instruction was necessary to evaluate J's credibility because of the lack of corroborative evidence and her difficulty recalling the abuse at trial. We disagree and conclude that these concerns were sufficiently addressed by the general credibility instruction provided to the jury by the trial court.

rules intended to guide the lower courts in the administration of justice in all aspects of the criminal process. . . . We ordinarily invoke our supervisory powers to enunciate a rule that is not constitutionally required but that we think is preferable as a matter of policy." (Citation omitted; internal quotation marks omitted.) *State* v. *Medrano*, 308 Conn. 604, 630, 65 A.3d 503 (2013).

In *James*, this court overruled its earlier decision in *State* v. *Anderson*, 152 Conn. 196, 205 A.2d 488 (1964), and held that a trial court retains broad discretion over whether to grant requests for special child credibility instructions. *State* v. *James*, supra, 211 Conn. 570–71. "In so doing, [this court] noted the difficulty in fixing an age when such an instruction would be necessary, and expressed concern that singling out the testimony of the child witness for special scrutiny may infringe [on] the jury's exclusive role as arbiter of credibility." (Internal quotation marks omitted.) *State* v. *Angell*, 237 Conn. 321, 330, 677 A.2d 912 (1996); see *State* v. *James*, supra, 568. The court in *James* additionally reasoned that "[a]uthorities, more qualified than judges in regard to child behavior, question the conventional wisdom that children are less likely to be truthful on the witness stand than adults . . . ." *State* v. *James*, supra, 568.

Because trial courts retain discretion to consider, at the defendant's request and on the basis of the particular facts of the case, whether to give a special credibility instruction, there is no need to exercise our supervisory authority and to disrupt our holding in *James*. "[I]n a case involving the sexual abuse of a very young child, that child's capacity to recall specifics, and the state's concomitant ability to provide exactitude in an information, are very limited." (Internal quotation marks omitted.) *State* v. *Stephen J. R.*, 309 Conn. 586, 596, 72 A.3d 379 (2013). Thus, "[t]his court will not impose a degree of certitude . . . that will render prosecutions of those who sexually abuse children impossible." *State* v. *Sara-*

*ceno*, 15 Conn. App. 222, 237, 545 A.2d 1116, cert. denied, 209 Conn. 823, 552 A.2d 431 (1988), and cert. denied, 209 Conn. 824, 552 A.2d 432 (1988).

The defendant also argues that child witnesses should be treated like the narrow classes of witnesses that we have concluded warrant a special credibility instruction, namely, jailhouse informants, accomplices, and complaining witnesses. See, e.g., *State* v. *Bruny*, 342 Conn. 169, 202, 269 A.3d 38 (2022). Children as a class do not present the same inherent unreliability as these witnesses, who have "a powerful incentive, fueled by self-interest, to implicate falsely the accused." *State* v. *Diaz*, 302 Conn. 93, 102, 25 A.3d 594 (2011); see also *State* v. *Ceballos*, supra, 266 Conn. 422–23 (noting that research does not suggest children are less likely to be truthful). In cases of child sexual abuse, we are confident that "cross-examination and argument by counsel are . . . likely to be adequate tools for exposing the truth . . . ." *State* v. *Diaz*, supra, 110. Accordingly, we decline to exercise our supervisory authority to hold that a defendant is entitled to a special child credibility instruction.

The judgment is affirmed.

In this opinion the other justices concurred.